In re Marie BRUNNER, Debtor.

Marie BRUNNER, Plaintiff-Appellee,

v.

NEW YORK STATE HIGHER EDUCA-TION SERVICES CORPORATION, Defendant-Appellant.

No. 83 Civ. 4588–CSH.

United States District Court, S.D. New York.

Feb. 21, 1985.

Marie Brunner, pro se.

Barbara C. North, Albany, N.Y., for defendant-appellant.

## MEMORANDUM OPINION
## AND ORDER

HAIGHT, District Judge:

This is an appeal from an April 12, 1983 oral decision of Hon. Howard Schwartzberg, Bankruptcy Judge, discharging appellee Marie Brunner's student loans pursuant to 11 U.S.C. § 523(a)(8)(B). Section 523(a)(8)(A) of the Bankruptcy Code, 11 U.S.C. § 523(a)(8)(A), declares such loans nondischargeable for five years after they first come due, but § 523(a)(8)(B) creates an exception to the general rule if the failure to discharge would "impose an undue hardship on the debtor and the debtor's dependents." Judge Schwartzberg found such undue hardship and discharged appellee's student loans. Appellant New York State Higher Education Services Corp. ("HESC"), guarantor of the loans, contends that this was error.

Appellee received a Bachelor of Arts degree in 1979 and a Master's degree in Social Work in May, 1982. Approximately seven months after receiving her Master's degree appellee filed for personal bankruptcy, and her outstanding debts, exclusive of approximately $9,000 in student loans, were discharged. Two months later, upon expiration of the nine month grace period suspending repayment of the student loans incurred during her undergraduate and graduate education, appellee filed this adversary action seeking discharge of her accumulated student loans. Following a brief oral hearing at which appellee described her shaky finances and her unsuccessful efforts to find work following her graduation, Judge Schwartzberg issued a decision from the bench discharging the loans. HESC, which had assumed the loans from Anchor Savings Bank following appellee's default, takes this appeal from that finding. Appellee's counsel below has apparently deserted her, for no responsive brief was filed on her behalf. It is assumed that she opposes the appeal.

### I.

"Undue hardship" is undefined in the Bankruptcy Code. The existence of the adjective "undue" indicates that Congress viewed garden-variety hardship as insufficient excuse for a discharge of student loans, but the statute otherwise gives no hint of the phrase's intended meaning. The question has produced a daunting proliferation of decisions in the Bankruptcy Courts, but there is little appellate authority.[1] The statutory history has thus provided the lodestone for most interpretations.

Congress itself had little to say on the subject. The initial House bill deleted any reference to student loans, while the Senate bill included language similar to that present in the final bill. *See* H.R. 8200, 95th Cong., 1st Sess. (1977), *reprinted in* Collier on Bankruptcy, Appendix 3 (15th Ed.1979), at III–1 (hereafter "Collier"); S.

---

**1.** The sole authority from the Courts of Appeals appears to be *In re Andrews,* 661 F.2d 702 (8th Cir.1981); the only published decision from the district courts is a summary affirmance, *In re Wells v. People ex rel. Illinois State Scholarship Commission,* 37 B.R. 687 (N.D.Ill.1984).

2266, 95th Cong., 2d Sess. (1978), *reprinted in* Collier, *supra,* Appendix 3, at VII–1, 417. The Senate Report which accompanied the bill, however, is mute on the issue of undue hardship, noting merely that the bill "follows generally current law and excepts from discharge student loans until such loans have been due and owing for five years." The final compromise bill accepted the Senate's language, but the report of the compromise committee—printed only as the remarks of the two Congressional sponsors of the bill—again ignores undue hardship. *See, e.g.,* 124 Cong.Rec.H. 11096, 95th Cong., 2d Sess. (daily ed. Sept. 28, 1978), *reprinted in* Collier, *supra,* Appendix 3, at IX–101.

The phrase "undue hardship" was lifted verbatim from the draft bill proposed by the Commission on the Bankruptcy Laws of the United States ("the Commission"). The Commission's report provides some inkling of its intent in creating the exception, intent which in the absence of any contrary indication courts have imputed to Congress. The Commission noted the reason for the Code provision: a "rising incidence of consumer bankruptcies of former students motivated primarily to avoid payment of educational loan debts." Report of the Commission on the Bankruptcy Laws of the United States, House Doc. No. 93–137, Pt. I, 93d Cong., 1st Sess. (1973) at 140 n. 14, *reprinted in* Collier, *supra,* Appendix 2, at PI–i. This "rising incidence" contravened the general policy that "a loan ... that enables a person to earn substantially greater income over his working life should not as a matter of policy be dischargeable before he has demonstrated that for any reason he is unable to earn sufficient income to maintain himself and his dependents and to repay the educational debt." *Id.* at 140, n. 15. The Commission implemented this policy by·delaying dischargeability for five years, a time period which, it was anticipated, "gives the debtor an opportunity to try to meet his payment obligation." After five years, the exception is lifted in recognition of the fact that "in some circumstances the debtor, because of factors beyond his reasonable control, may be unable to earn an income adequate both to meet the living costs of himself and his dependents and to make the educational debt payments." *Id.* at 140, n. 16. As a calculation of "undue hardship," the Commission envisioned a determination of whether the amount and reliability of income and other wealth which the debtor could reasonably be expected to receive in the future could maintain the debtor and his or her dependents at a minimal standard of living as well as pay off the student loans. *Id.* at 140–41, n. 17.

Most courts have accepted that a debtor must at least satisfy the "minimal standard of living" test before a discharge of his or her student loans will be granted. *See, e.g., In re Johnson,* 5 B.C.D. 532, 537 (Bankr.E.D.Pa.1979); *In re Andrews,* 661 F.2d 702, 704 (8th Cir.1981). That is, before receiving a discharge of student loans the debtor is required to demonstrate that, given his or her current income and expenses, the necessity of making the monthly loan payment will cause his or her standard of living to fall below a "minimal" level. Indeed, if the calculation of future earnings and expenses were an exact science, a similar showing extended into the future might be all that would be necessary to justify discharge. After all, it is not unreasonable to hold that committing the debtor to a life of poverty for the term of the loan—generally ten years—imposes "undue" hardship.

Predicting the future, however, is never so easy. Minimum necessary future expenses may be ascertained with some precision from an extrapolation of present needs, but unpredictable changes in circumstances such as illness, marriage, or childbirth may quickly wreak havoc with such a budget. Even more problematic is the calculation of future income. It is the nature of § 523(a)(8)(B) applications that they are made by individuals who have only recently ended their education. Their earning potential is substantially untested, and because they are inexperienced they are in all likelihood at the nadir of their earning power. They may, like appellee, have had diffi-

culty in securing employment immediately after graduation. Extrapolation of their current earnings is likely to underestimate substantially their earning power over the whole term of loan repayment.

It is no doubt for this reason that many courts have required more than a showing on the basis of current finances that loan repayment will be difficult or impossible. Perhaps the best articulation of this doctrine is that of Judge Lifland of the Bankruptcy Court of this district, who wrote that "dischargeability of student loans should be based upon the certainty of hopelessness, not simply a present inability to fulfill financial commitment." *In re Briscoe*, 16 B.R. 128, 131 (Bankr.S.D.N.Y. 1981).[2] Stated otherwise, the debtor has been required to demonstrate not only a current inability to pay but additional circumstances which strongly suggest that the current inability to pay will extend for a significant portion of the repayment period of the loan.

In addition to Judge Lifland's language, this test has been formulated as the necessity of showing of "unique" or "exceptional" circumstances. *See, e.g., In re Densmore*, 8 B.R. 308, 309 (Bankr.N.D.Ga.1979); *In re Rappaport*, 16 B.R. 615, 617 (Bankr. D.N.J.1981). Such circumstances have been found most frequently as a result of illness, *e.g., In re Norman*, 25 B.R. 545, 550 (Bankr.S.D.Cal.1982), a lack of usable job skills, *e.g., In re Seibert*, 10 B.R. 704 (Bankr.S.D.Ohio 1981), the existence of a large number of dependents, *In re Clay*, 12 B.R. 251 (Bankr.N.D.Iowa 1981), or a combination of these. *In re Diaz*, 5 B.R. 253 (Bankr.W.D.N.Y.1980); *Shoberg v. Minnesota Higher Education Coordinating Council*, 41 B.R. 684, 687 (Bankr.D.Minn. 1984); *In re Dresser*, 33 B.R. 63 (Bankr.D. Me.1983).

Some courts, following the lead of *In re Johnson, supra*, 5 B.C.D. at 740, have required a showing of "good faith" prior to discharge. There is no specific authority for this requirement, but the need for some showing of this type may be inferred from comments of the Commission report. In discussing the discharge of loans after five years, when a showing of undue hardship is no longer required, the Commission noted that such discharge is fair because the debtor may be unable to repay his or her debts due to "factors beyond his reasonable control." *Report, supra*, at 140 n. 16. If external circumstances were seen as justifying discharge after five years, it is likely that only such circumstances should be permitted to justify discharge prior to that time. The propriety of a requirement of good faith is further emphasized by the stated purpose for § 523(a)(8): to forestall students, who frequently have a large excess of liabilities over assets solely because of their student loans, from abusing the bankruptcy system to shed these loans. *Id.* at 140, n. 14.[3]

**2.** This position has gained a number of adherents. *See, e.g., In re Moorman*, 44 B.R. 135, 137 (Bankr.W.D.Ky.1984); *In re Reid*, 39 B.R. 24, 26 (Bankr.E.D.Tenn.1984); *In re Love*, 33 B.R. 753, 755 (Bankr.E.D.Va.1983); *In re Holzer*, 33 B.R. 627, 632 (Bankr.S.D.N.Y.1983) (Berk, B.J.); *In re Lezer*, 21 B.R. 783, 788 (Bankr.N.D.N.Y.1982).

**3.** In connection with the showing of good faith and circumstances beyond the control of the debtor several courts have permitted debtors to discharge their loans upon a showing that the education for which the loans paid has been of little use to them. *See, e.g., In re Littell*, 6 B.R. 85 (Bankr.D.Or.1980); *In re Connolly*, 29 B.R. 978, 982 (Bankr.D.Fla.1983); *In re Powelson*, 25 B.R. 274, 276 (Bankr.D.Neb.1982). Consideration of this factor is not only improper, it is antithetical to the spirit of the guaranteed loan program. As described in more detail *infra*, the loan program grants aid regardless of the financial stability of the debtor or the wisdom of his or her individual choice to pursue further education. Consideration of the "value" of the education in making a decision to discharge turns the government into an insurer of educational value. Those students who make wise choices prosper; those who do not seek to discharge their loans in bankruptcy. This is wholly improper.

The courts which consider this factor seem to view it as a way to punish institutions for forcing on students loans which are not in their best interests. *See, e.g., In re Powelson, supra*, 25 B.R. at 275. Regardless of whether such an attitude is proper, the courts' chosen remedy is ineffectual. The burden is borne not by the institution but by taxpayers, who absorb the cost of the default. As noted in *Powelson*, a

Thus it is proper to require a debtor to show that he or she has made good faith efforts to repay the loan and that the forces preventing repayment are truly beyond his or her reasonable control. *See In re Rappaport, supra,* 16 B.R. at 617.

The effect of these requirements is to make student loans a very difficult burden to shake without actually paying them off. While this result may seem draconian, it plainly serves the purposes of the guaranteed student loan program. When making such loans, the government (as guarantor) is unable to behave like ordinary commercial lenders, who may, after investigating their borrowers' financial status and prospects, choose to deny as well as grant credit and may adjust the interest rate which they charge according to their judgment as to the likelihood of repayment. The government has no such luxury. It offers loans at a fixed rate of interest, and it does so almost without regard for creditworthiness. Indeed, because it bases its loan decisions in part on student need, it arguably offers loans selectively to the worst credit risks.

Because of this enlightened social policy, those whose past work or credit record might foreclose them from the commercial loan market are able to obtain credit at subsidized rates to advance their education. Those who might obtain loans only at exhorbitant rates are similarly able to obtain low cost, deferred loans. In return for this largesse—and it is undeniable that guaranteed student loans have extended higher education to thousands who would otherwise have been forced to forego college or vocational training—the government exacts a *quid pro quo.* Through § 523(a)(8) it commits the student to repayment regardless of his or her subsequent economic circumstances. In return for giving aid to individuals who represent poor credit risks,

it strips these individuals of the refuge of bankruptcy in all but extreme circumstances. *See Johnson v. Edinboro State College,* 728 F.2d 163, 164 (3d Cir.1984) (Section 523(a)(8) represents a conscious Congressional choice to override the normal "fresh start" goal of bankruptcy). This is a bargain each student loan borrower strikes with the government. Like all bargains, it entails risk. It is for each student individually to decide whether the risks of future hardship outweigh the potential benefits of a deferred-payment education.[4]

In conclusion, obtaining a discharge of student loans in bankruptcy prior to five years after they first come due requires a three-part showing: 1) that the debtor cannot, based on current income and expenses, maintain a "minimal" standard of living for himself or herself and his or her dependents if forced to repay the loans, 2) that this state of affairs is likely to persist for a significant portion of the repayment period of the student loan, and 3) that the debtor has made good faith efforts to repay the loans.

## II.

It remains to apply these principles of law in review of the decision at hand. Under Bankruptcy Rule 8013, the "clearly erroneous" standard of review is applicable to findings of fact by a Bankruptcy Judge, but "the district court is not bound by the clearly erroneous standard when reviewing the bankruptcy court's application of a legal standard to facts reasonably found." *In re Penn-Dixie Industries, Inc.,* 9 B.R. 936, 938 (S.D.N.Y.1981).

The debtor's testimony at the hearing below revealed the following. Appellee gained a Bachelor's degree in Psychology in 1979 and a Master's degree in Social Work in 1982. Her age was not specified,

student loan *is* an investment, but it is for the borrower, not the taxpayers, to evaluate the wisdom of the investment and bear the risks and burden if the investment proves improvident.

**4.** The government is not out to make life as unpleasant as possible for borrowers who suffer

financial difficulties. Deferment and cancellation are available under appropriate circumstances. *See* 34 C.F.R. §§ 674.34, 674.34a, 674.51–59 (1984) (National Direct Student Loan program).

but she first entered college in 1972. She has supported herself since that time through a variety of full- and part-time jobs, student loans, and educational stipends. She has no dependents. During the decade prior to the hearing, her greatest annual income was $9,000.

No specific testimony about appellee's annual expenses was elicited other than that her rent is $200 per month. At the time of the hearing she was receiving $258 per month in public assistance, $49 per month in food stamps, and Medicaid. She had been receiving this aid for approximately four months prior to the hearing. Her testimony as to her source of support prior to that time was vague. At the time of the hearing, she possessed a bank account holding $200, but two months prior to the hearing she withdrew $2,400 from her savings to purchase a used car. Upon her filing for bankruptcy four months prior to the hearing, her student loans constituted 80% of her total indebtedness.

Appellee testified that she had sent out "over a hundred" resumes in search of employment in her chosen field of work but was unsuccessful. She noted that many of her classmates found themselves similarly unable to find such jobs. The extent to which she had attempted to find work outside her field was unclear. In response to her lawyer's inquiry as to whether she had sought clerical or other jobs, she replied, "I don't have secretarial skills, but I have applied for any position that I could find." She did not recount any specific jobs which she had sought and been refused. On cross-examination she conceded that she had done clerical work in the past. Although appellee was seeing a therapist for treatment of anxiety and depression due in part to her unemployment, she testified that she was capable of working.

In a brief oral ruling, the bankruptcy judge found that "she is not presently employed; prospects in the future do not look bright ... there does not appear to be any great demand for psychologists or social workers, or at least ... there is not anything available. She has a psychological impairment, as well as a lack of future employment opportunity.... I find ... that the paucity of income that the debtor receives from public assistance would not be available to her to repay, and it would work an undue hardship upon her to have to dip into those funds." As a consequence, the judge discharged the loans.

◼ At the outset, it appears that the judge's finding that appellee possesses a "psychological impairment" is clearly erroneous. Although appellee testified that she was consulting a therapist, there is no evidence in the record that her depression and anxiety impair her capacity to work. She has no "impairment" in any relevant sense of the word.

◼ Even in the absence of this finding, appellee appears to be a woman who is unlikely to find a job in her chosen field of work in the near future. However, she is an apparently healthy, presumably intelligent, and well-educated woman. Although she claimed to be unable to find any other type of work, the evidence presented at the hearing is too thin to support a finding that her chances of finding any work at all are slim, and I do not read the bankruptcy judge's decision as so finding. She has no dependents or any other extraordinary burdens which would impair her finding other work, or, once it is found, make it unlikely that she can both support herself and pay off her student loans.

In short, appellee at most proved that she is currently—or was at the time of the hearing—unable both to meet her minimal expenses and pay off her loans.[5] This

---

5. Even this is uncertain. The bankruptcy judge failed to require, and appellee failed to submit, a statement of expenses and income. The testimony at the hearing, accepted at face value, indicates that appellee had been surviving for several months on monthly income of $107 in food stamps and cash above the cost of her rent.

From this $107 appellee must have paid for food, clothing, utilities, entertainment, and the costs of registering, insuring, and maintaining a $2,400 car. It seems incredible that this sum could stretch so far, indicating that appellee had sources of income which she failed to reveal. It must be remembered that although appellee's

alone cannot support a finding that the failure to discharge her loans will impose undue hardship. *See, e.g., In re Briscoe, supra,* 16 B.R. at 131; *In re Henry,* 4 B.R. 495 (Bankr.S.D.N.Y.1980); *Panteli v. New York State Higher Education Services Corp.,* 41 B.R. 856, 858 (Bankr.S.D.N.Y. 1984). Nothing in the record supports a finding that it is likely that her current inability to find any work will extend for a significant part of the repayment period of the loan or that she has "a total incapacity now and in the future to pay [her] debts for reasons not within [her] control." *In re Rappaport, supra,* 16 B.R. at 617. She is skilled, apparently capable, well, and without dependents. Nor has she adequately demonstrated good faith in attempting to pay off her loans. She filed for discharge within a month of the date the first payment of her loans came due. She has made virtually no attempt to repay, nor has she requested a deferment of payment, a remedy open to those unable to pay because of prolonged unemployment. *See, e.g.,* 34 C.F.R. § 674.34(d)(2) (1984). Inasmuch as this is her primary reason for requesting discharge, initial resort to the less drastic remedy of deferment would have been more appropriate than bankruptcy.

It was error for the bankruptcy court to discharge appellee's student loans. The decision of the bankruptcy judge is reversed. In compliance with the suggestion of *In re Andrews, supra,* 661 F.2d at 705 n. 5, the action is remanded with the direction that appellee's loans be declared nondischargeable without prejudice to her seeking such relief again pursuant to Rule 409(a)(1), R.Bankr.P.

It is SO ORDERED.

budget was this thin, she nevertheless felt financially secure enough to spend her life savings on a car one to two months prior to the hearing.