**In re Jeremiah BROWN and Catherine Brown, Debtors.**

**Jeremiah BROWN and Catherine Brown, Plaintiffs,**

v.

**SALLIEMAE SERVICING CORP., Great Lakes Higher Education Corp., and Hemar Insurance Corporation of America, Defendants.**

Bankruptcy No. 98–1238.
Adversary No. 98–90116.

United States Bankruptcy Court,
S.D. California.

Dec. 9, 1998.

Jeremiah Brown, Oceanside, California, for Plaintiffs.

Mathew Dew, Dew & Blaney, Madison, Wisconsin, and Martin T. McGuinn, Hinchy, Witte, Wood, Anderson & Hodges, San Diego, California, for Defendant Great Lakes Higher Education Corp.

Melissa Blackburn, Mulvaney, Kahan & Barry, San Diego, California, for Defendant Hemar Insurance Corporation of America.

## MEMORANDUM OF DECISION

JIM D. PAPPAS, Chief Judge.

### I.  Background

In this adversary proceeding, Plaintiffs Jeremiah and Catherine Brown, Chapter 7

debtors, seek to discharge several student loan obligations in their Chapter 7 bankruptcy proceeding under Section 523(a)(8) of the Bankruptcy Code. The adversary proceeding was initially brought against Salliemae Servicing Corporation. However, Defendants Hemar Insurance Corporation of America ("Hemar") and Great Lakes Higher Education Corporation ("Great Lakes"), the real parties in interest regarding the loans, were added as defendants.

On September 28, 1998, a trial was held in the action in San Diego, California. Mr. Brown appeared pro se and was the only witness called to testify by any of the parties. Following conclusion of the evidence and testimony, the Court took the issues under advisement. The following constitutes the Court's findings of fact and conclusions of law. F.R.B.P. 7052.

## II. Facts

Plaintiff Jeremiah Brown is thirty-eight years old. He and his wife Catherine Brown, age thirty-one, are the parents of a two-year old daughter, Isabeau, and are expecting another child in December 1998. Mr. Brown has a young son, Jerrel Brown, who lives with his mother in Oregon.

Mr. Brown has served in the United States Marine Corps for over twenty years. While in the Marines, Mr. Brown pursued his higher education on a part-time basis. In 1992, Mr. Brown received a Bachelor of Science degree from Park College in financial management. Mr. Brown enrolled in law school at the University of San Diego in 1993, hoping to obtain a law degree in a full-time evening program. Mr. Brown's first year of studies was, on occasion, interrupted by his commitment to the Marines. When the Marines would deploy, he would be required to leave without advance notice. Due to these interruptions, he did not complete his first year of studies. However, under the circumstances, the law school allowed Mr. Brown to return a second year in order to complete his first year curriculum.

Mr. Brown completed his first year of law studies during 1994 and 1995 without any Marine deployments. However, he was deployed overseas the following year. Upon his return to San Diego, Mr. Brown once again enrolled in the law school evening program and completed an entire year of studies. After only several weeks in the summer semester, Mr. Brown was informed by the school that he was being "academically disenrolled." He was told that he could not attend the law school again for at least one year, and even then he would be required to re-apply and would be given no credit for courses previously completed. He was also told by the Dean of the law school that, given his situation as a full-time Marine, his chances were "slim" of being allowed to re-enroll.

While in school, Mr. Brown took out loans to help pay the substantial tuition and school expenses. Several months after being disenrolled from law school, the educational loans became due. Because his pay as a Marine was needed to meet his other obligations, Mr. Brown requested and was granted two forbearances by the student loan servicing agents. His financial situation, understandably, did not improve, and no payments were ever made on the loans.

On January 28, 1998, Plaintiffs filed for Chapter 7 relief. On March 2, 1998, Mr. Brown, acting pro se, commenced this adversary proceeding.

## III. Discussion

A debtor will not be discharged from a government guaranteed student loan unless, either, (1) the loan has been in repayment for at least seven years [1] or (2) the debtor can establish that excepting the debt from discharge "will impose an undue hardship on the debtor and the debtor's dependents." 11 U.S.C. § 523(a)(8). In this case, Plaintiffs seek a discharge solely under the undue hardship exception.

1. Section 523(a)(8) has been amended to eliminate the seven year repayment exclusion. Higher Education Amendments of 1998, Pub.L. No. 105–244, 112 Stat. 1581, 1837. However, the change applies only in bankruptcy cases filed on or after October 7, 1998, the date on which the President signed the bill into law.

The term "undue hardship" is not defined by the Bankruptcy Code. Definitions of the term have developed in case law. The Ninth Circuit recently adopted the standard for determining undue hardship applied in *In re Brunner*, 46 B.R. 752 (S.D.N.Y.1985), aff'd, 831 F.2d 395 (2d Cir.1987). *United Student Aid Funds, Inc. v. Pena (In re Pena)*, 155 F.3d 1108 (9th Cir.1998).

■ Under *Brunner*, a three-part test is employed to analyze whether a debtor faces undue hardship if a student loan is not discharged. "First, the debtor must establish 'that she cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans.'" *United Student Aid Funds, Inc. v. Pena (In re Pena)*, 155 F.3d 1108, 1111 (9th Cir.1998) (quoting *In re Brunner*, 831 F.2d 395, 396 (2d Cir.1987)). Next, the debtor must show that additional circumstances exist suggesting that the debtor's financial condition is likely to continue for at least a significant portion of the repayment period. *Id.* Finally, the debtor must have made a good faith effort to repay the obligation. *Id.*

## A. Minimal Standard of Living

■ The Court first looks to Plaintiffs' income and expense to decide whether they could maintain a minimal standard of living if required to repay the student loans. This determination is committed to the discretion of the bankruptcy court. *Pena* at 1112.

Plaintiffs' monthly income is stated in Mr. Brown's Marine Corps Leave and Earnings Statement. Mr. Brown's base pay of $2,713.50 per month is increased by $625.20 for a housing allowance and $222.90 for rations bringing his total gross monthly income to $3,561.60. The gross income figure is then subject to deductions for whole life insurance ($100.00), term life insurance ($26.35), savings/IRAs ($150.00), federal tax ($372.24), social security ($168.23), Medicare ($39.34), SGLI (Servicemen's Group Life Insurance) ($17.00), family dental ($19.09), government housing ($625.20), USN*MC Ret. Home ($.50), and garnishment for a child support obligation ($404.00) for total deductions of $1,921.95. When the total deductions are subtracted from the gross income, Mr. Brown's take home pay is $1,639.00.

Defendants raise concerns about several of the deductions. First, Defendants question the deductions for life insurance. Each month, Mr. Brown pays premiums on two term life insurance policies covering himself and his family. The premiums total $43.35 ($26.35 plus $17.00) per month. In addition to the term insurance, $100.00 is deducted every month for a whole life policy covering both Plaintiffs. However, given Plaintiffs' ages and circumstances, the amounts of insurance coverage seem necessary and the premiums do not seem excessive to the Court.

Defendants next question the contributions of $150.00 each month made by Mr. Brown to Individual Retirement Accounts (IRAs), one for each Plaintiff. At trial, Defendants pointed out that Mr. Brown is currently eligible for retirement after twenty years of service at one-half of his annual base pay. The amount of his retirement benefit increases by two and one-half percentage points for each additional year of service after twenty years. In other words, Defendants contend that Mr. Brown is provided an adequate retirement benefit through the military so that IRA contributions are not necessary to meet a minimal standard of living.

While it is not imprudent for Plaintiffs to contribute to IRAs to increase the amount available upon retirement, given the fact that Plaintiffs have just recently initiated this practice in June of 1998, this Court concludes that it would not be appropriate at this time for Plaintiffs to utilize the funds for this purpose. Plaintiffs are relatively young, and in light of their financial circumstances, there is time in the future to establish and build a private, supplemental retirement fund. For this reason, the IRA deductions of $150.00 will be added back in to Plaintiffs net income figure, now $1,789.00, for purposes of this analysis.

Next, Plaintiffs' monthly expenses must be examined. For this, the Court turns to Plaintiffs' Schedule "J" filed with their Chapter 7 petition which lists total monthly expenses of $2,086.00. However, this figure

includes the $404.00 support payment which was deducted from gross income when arriving at take home pay. The schedules also include $510.00 per month paid for credit card debt which the Court presumes to have been discharged in Plaintiffs' bankruptcy case, as well as an auto payment of $453.00 for a Jeep Cherokee that Plaintiffs no longer owns. When these expense items are disregarded, the resulting total monthly expenses on Schedule "J" total $719.00.

Mr. Brown filed a "Correction to Expenses," in which some of the Schedule "J" expenses are adjusted. Certain expenses, such as cable television ($34.00), telephone ($75.00), home maintenance ($50.00), recreation ($20.00), and auto insurance ($60.00) remain the same as the original Schedule "J." Other items were adjusted to reflect an increase such as food ($360.00, up $60.00), clothing ($110.00, up $30.00), and laundry ($60.00, up $20.00). One expense, Plaintiffs' auto payment, which was listed on Schedule "J" at $453.00, was backed out above since the vehicle has been surrendered. However, Plaintiffs have subsequently purchased a 1992 Chevrolet Camaro for which the monthly payments amount to $172.35. Mr. Brown has also added several expenses related to visitation of a son, who currently lives in Oregon with his mother. The additions included $318.00 for airfare, $110.00 for lodging and meals, and $80.00 for a car rental, for a total of $508.00 per month. The sum of these adjustments totals $790.35. When this amount is added to the remaining Schedule "J" expenses of $719.00, Plaintiff's expenses are approximately $1,509.00 per month.

Defendants raise an objection to Mr. Brown's projected visitation travel expenses in his amended expense statement. Defendants argue that these items of anticipated expense are too high, and that Mr. Brown has no history of visitation to support these expenses. Defendants are correct that Mr. Brown has never taken a trip to Oregon to visit his son. However, as Mr. Brown explained at trial, he and his son's mother are estranged and not even on speaking terms.

Before Mr. Brown's visitations may begin, his visitation rights will likely have to be established through court proceedings. These proceedings will undoubtedly be costly and time-consuming.

Mr. Brown's desire to establish and maintain visitation rights with his minor child is reasonable and justifiable, and he must have the funds available to do so. However, the expenses as Plaintiffs now project them are, at least in part, unreasonable. The Court believes that these expense projections should be reduced for purposes of this analysis, and lacking other evidence, will allow only one-half, or $254.00 per month, as part of Plaintiffs' budget. To the Court, given the distance between Mr. Brown and his son, and taking into account the history of their relationship, it is more reasonable to anticipate visitation expenses will occur less frequently than monthly. Initially, the monthly expense is seen as helping defray the cost of establishing Mr. Brown's visitation rights. Assuming Mr. Brown is successful, the Court concludes that it is more realistic to project that visitation will be allowed to occur every other month.[2] While expenses are not currently being paid for visits, the Court has no reason to question Mr. Brown's sincerity in his desire to establish a relationship which includes frequent visits in the near future. Therefore, for the purposes of this analysis, the Court will reduce Plaintiffs' expenses, which after this adjustment, total $1,255.00.

The Court must also observe that Plaintiffs' budget is extremely conservative and does not contain any projected miscellaneous expenses, or any unexpected expenses that, in the Court's experience, seem to arise almost every month. For example, there is no expense projection to meet medical costs for family members, who do not receive the same military health care benefits as Mr. Brown does. In addition, Plaintiffs are expecting their second child in December 1998, something which will undoubtedly raise their household expenses.

The Court will allow an additional $200 per month as a contingency for unbudgeted

---

**2.** Obviously, the Court is challenged to divine what a state court may envision as a reasonable visitation regimen. The Court's conclusion also assumes that given Mr. Brown's other commitments, he will be able to visit his son, on average, only about every other month.

items. Doing so suggests Plaintiffs have $334 per month in disposable income ($1,789 net income less $1,455 in projected expenses). To apply the first of the *Brunner* elements, the question becomes whether Plaintiffs can maintain a minimal standard of living if they are required to repay the student loans given such a budget.

How much of a payment would be required to satisfy the student loan debts? As of the date of trial, according to Defendants' evidence, Mr. Brown's outstanding obligations totaled $96,628.08, of which $85,255.18 was owed to Great Lakes and $11,372.90 was owed to Hemar. Contract interest on these obligations is approximately 8%. *See* Defendants' Exhibit A, Section E. Using a loan repayment period of 10 years, the term provided in the loan agreements, *see* Defendants' Exhibit A, Section G, the monthly payment required to service the student loan debt would be about $1,172.00. Looking at another repayment scenario, assuming Plaintiffs continue to have disposable income of $334 per month available to pay on these loans, it would take Plaintiffs almost 24 years to pay off just the principal balance, without even considering any accruing interest. When interest is taken into consideration, Plaintiffs would never be able to pay off the obligation while making payments of $334.00 per month.

The Court finds that if Plaintiffs are required to pay off the student loans over a reasonable, even generous ten year period of time, Plaintiffs could not maintain a minimal standard of living. Alternatively, the Court does not find it reasonable to require that Plaintiffs spend the rest of their life paying all of their projected disposable income to Defendants. Thus, the Court concludes that Plaintiffs have satisfied the first prong of the *Brunner* test.

### B. Continuing Circumstances

The Court has identified several facts in this case that it deems important to consider in deciding whether Plaintiffs' situation may be expected to improve in the foreseeable future, the second prong of the *Brunner* test. The first focuses upon Plaintiffs' income. While Defendants point out that Mr. Brown, as a federal employee, is likely to receive an annual raise in pay, such increases are designed merely to offset increased costs of living. The raises have recently ranged between 2% and 3%, and are entirely dependent upon the national political and economic environment. Therefore, the Court considers the likelihood of future salary increases in excess of those needed to meet inflation speculative, and not a factor suggesting Plaintiffs' disposable income will significantly improve.

Defendants also suggest that Plaintiffs could obtain additional employment to supplement their current income. As a full-time member of the military, the Court finds it is simply not practical for Mr. Brown to obtain a steady, part-time second job. As he experienced in trying to achieve a law degree, Mr. Brown's duties have required him to deploy to distant locations for sometimes extended periods of time, which he also testifies may include an overseas assignment in the near future. Moreover, it is not as if Brown has significant amounts of time available to devote to a second job. His military obligations are not comparable to an "eight to five" job in the private sector. He has full-time employment with competitive benefits. Under the circumstances, the Court believes it would be unreasonable to require Mr. Brown to seek part-time employment.

Defendants further urged that Mr. Brown seek employment within the fields he has studied to increase his earnings. In truth, while Mr. Brown has a degree in financial management, he has no work experience in this field. The Court is not persuaded that Mr. Brown would be financially better off to leave the military and pursue employment in the financial arena, even if he could find a suitable entry-level position. To do so would be detrimental to Mr. Brown's retirement benefits and, at least for a time, to his monthly income as well. Defendants' assertion that Mr. Brown obtain part-time or full-time employment in the legal field is also ill-founded. With no disrespect intended to Mr. Brown, it seems highly unlikely that a market exists in the legal profession for applicants who have completed only a modest

portion of the law school curriculum, and who have been academically disenrolled.

As for Mrs. Brown, Defendants correctly submit that she could obtain employment to help increase Plaintiffs' monthly income. The practical benefit stemming from her employment, though, would be negligible. As of the date of trial, Mrs. Brown was pregnant. Assuming she could enter the workforce in February or March of 1999, what type of job is Mrs. Brown qualified to perform? Without refutation, at trial Mr. Brown testified that his wife had a high school education and had some experience working at a day care center on the military base, and at a movie theater prior to that. At both jobs, Mrs. Brown earned what amounted to minimum wage. Assuming that Mrs. Brown could obtain employment at minimum wage, her monthly gross wages would be approximately $892.00 (52 weeks times 40 hours per week times $5.15 per hour divided by 12 months). Assuming monthly withholding amounting to 20%, Mrs. Brown's take home pay would be approximately $714.00. However, Plaintiffs have a young daughter who would require day care services and Mr. Brown testified that the cost for such would range from $450.00 to $500.00 per month. Day care expenses for Plaintiffs' second child as a newborn would be somewhat higher. In other words, the cost of child care would likely exceed Mrs. Brown's wages. If she is to add to the Plaintiffs' net income, Mrs. Brown would have to obtain additional training or education, a process which would consume several years, assuming she could attend school only part-time. This training process also comes at a cost. The Court presumes Defendants would not require Plaintiffs to incur additional student loan debt so that the payments on their loans could be made. For these reasons, the Court considers it is unreasonable to require Mrs. Brown to obtain employment in this case.

The Plaintiffs' circumstances are likely to persist for what would amount to a significant portion of any student loan repayment period, if not indefinitely. There is no evidence showing Plaintiffs would be better off taking a different course of action. The second prong of the *Brunner* test is satisfied.

## C. Good Faith

Finally, Defendants argue that Plaintiffs do not meet the final *Brunner* requirement, namely that of good faith, since they have made no payments on the student loan obligations.

"With the receipt of a government-guaranteed education, the student assumes an obligation to make a good faith effort to repay those loans, as measured by his or her efforts to obtain employment, maximize income, and minimize expenses." *In re Roberson*, 999 F.2d 1132, 1136 (7th Cir.1993) (citation omitted). The standard of good faith under *Brunner* is similar, as it requires that a debtor, in order to show good faith, must make an effort to repay the loans or show "that the forces preventing repayment are truly beyond his or her reasonable control." *Brunner v. New York Higher Education Services Corp., (In re Brunner)*, 46 B.R. 752, 755 (S.D.N.Y.1985), aff'd 831 F.2d 395 (2nd Cir. 1987).

In this case, Plaintiffs have demonstrated their good faith. First, Mr. Brown has maintained his employment and has never sought to manipulate his income or expenses to avoid paying his loans. As explained above, Mr. Brown would not have financially benefitted by seeking employment elsewhere. Secondly, by maintaining his position in the Marines, Mr. Brown has maximized his income given his existing circumstances. In addition, as discussed above, Mrs. Brown has acted reasonably by staying in the home to care for her child. Thirdly, Plaintiffs have made noticeable attempts to minimize their expenses, such as their automobile expense. Plaintiffs propose a truly frugal budget.

Finally, Mr. Brown has attempted to repay his loans even though a payment has not been made. The failure to make a single payment on student loan obligations does not preclude a finding of good faith where debtor has not possessed the requisite resources to make such payments. *Lebovits v. Chase Manhattan Bank (In re Lebovits)*, 223 B.R. 265, 274 (Bankr.E.D.N.Y.1998) ("a debtor's good faith is interpreted in light of his ability to pay, a complete failure to make even

minimal payments on a student loan does not prevent a finding of good faith where the debtor never had the resources to make payments"); *In re Clevenger,* 212 B.R. 139, 146 (Bankr.W.D.Mo.1997). Here, Mr. Brown applied for and received two forbearances. This fact alone distinguishes Plaintiffs' case from the facts of *Brunner* where the debtor attempted to discharge her loan obligations almost immediately after graduation. *Brunner v. New York State Higher Education Services Corp. (In re Brunner),* 46 B.R. 752, 758 (S.D.N.Y.1985).

This case is similar to that before the court in *Reilly v. United Student Aid Funds (In re Reilly),* 118 B.R. 38, 42 (Bankr.D.Md.1990). In *Reilly,* the debtor had not made a payment on her student loans. The Court, however, held that the debtor was an honest person who had failed to make payments because she was struggling to make ends meet in light of her circumstances. The Court explained that the debtor's sincerity on the witness stand lead the Court to believe that the debtor would have made payments if she would have had the financial wherewithal to do so. The debtor's loans were discharged.

■ The same is true here. The forces preventing repayment are truly outside of Mr. Brown's reasonable control, and the explanations for his predicament are credible. Having met the good faith prong of the *Brunner* test, all elements have been met to support discharge of Plaintiffs' student loan obligations under Section 523(a)(8).

## IV. Partial Discharge

As found above, the Court concludes that Plaintiffs have some money available monthly to pay on their loans, but not enough to pay the loans in full under any reasonable scenario. In arguments made at trial, the parties discussed whether Mr. Brown's loans could be "partially discharged." Defendants asserted, and the Court agrees, that the facts of this case present a classic situation in which the Court should order that a portion of the student loans be repaid by Plaintiffs. A partial discharge approach is the best means of protecting the interests of all involved. Requiring Plaintiffs to devote their monthly disposable income ($334.00) for a reasonable time period (say five years) to the student lenders, provides some return to the lenders yet relieves Plaintiffs of what would otherwise be a life-long financial burden.

■ Unfortunately, a recent decision persuades the Court that a partial discharge is not appropriate even under these good facts. In *United Student Aid Funds Inc. v. Taylor (In re Taylor),* 223 B.R. 747 (9th Cir. BAP 1998), the Panel determined that the plain language of Section 523(a)(8) clearly precludes "partial discharge" of a student loan. The Panel reasoned that if Congress had intended the bankruptcy courts to except only part of qualifying debt from discharge, it would have added language to the statute anticipating such a result, such as by specifying a discharge "to the extent" that the debt will cause undue hardship or other qualifying language. *Taylor* at 753.

The Court notes that there is a substantial body of case law declining to accept the Bankruptcy Appellate Panel's interpretative approach, and allowing a partial discharge. *Tennessee Student Assistance Corp. v. Hornsby (In re Hornsby),* 144 F.3d 433, 438 (6th Cir.1998) (bankruptcy court, under Section 105 equitable powers, had authority to fashion partial discharge remedy); *Rivers v. United Student Aid Funds, Inc. (In re Rivers),* 213 B.R. 616, 619 (Bankr.S.D.Ga.1997) (failure to allow a partial discharge of student loans would produce, in some cases, absurd results); *see also Taylor* at 753, n. 12 (cases allowing partial discharge). The positions taken by the courts on both sides of the question are defensible, representing reasonable interpretations of the statute. The issue is ripe for decision by the Ninth Circuit Court of Appeals.

This Court has not decided whether it is truly "bound" by the decisions of this Circuit's B.A.P., another issue dividing the courts. While the issue has been decided in the affirmative by this Circuit's B.A.P. in the case of *In re Windmill Farms, Inc.,* 70 B.R. 618, 621 (9th Cir. BAP 1987), rev'd on other grounds, 841 F.2d 1467 (9th Cir.1988), other courts have held otherwise, *In re Junes,* 76 B.R. 795, 797 (Bankr.D.Or.1987), aff'd on oth-

er grounds, 99 B.R. 978 (9th Cir. BAP 1989). *See Bank of Maui v. Estate of Analysis, Inc.,* 904 F.2d 470, 471 (9th Cir.1989). However, the Court declines the opportunity to use this case as a vehicle for undertaking such an analysis. Absent a clear conviction that the Panel's interpretation of the statute is wrong, this Court will defer to the decision of the B.A.P. The parties, if they are so inclined, may address their arguments in favor of partial discharge to Congress or to the courts of the Circuit which are indisputably capable of establishing precedent. Since *Taylor* dictates that the Court take an "all or nothing" role in deciding the undue hardship issue, this Court is persuaded to side with the Plaintiffs under the facts of this case.

**Conclusion.**

For the reasons set forth above, Plaintiffs' obligations to Great Lakes and Hemar will be discharged pursuant to 11 U.S.C. § 523(a)(8). To do otherwise would truly impose an undue hardship upon Plaintiffs and their dependents. A separate judgment will be entered by the Court discharging the student loans.