In re Kathleen Mary WEGRZYNIAK, Debtor.

Kathleen Mary Wegrzyniak, Plaintiff,

v.

United States of America; Sallie Mae Servicing Corporation, Defendants.

Bankruptcy No. 96–00761.
Adversary No. 99–6083.

United States Bankruptcy Court, D. Idaho.

Oct. 21, 1999.

Robert W. Ward, Mountain Home, Idaho, for plaintiff.

Scott A. Tschirgi, Moffatt Thomas Barrett Rock & Fields, Boise, Idaho, for defendant.

## MEMORANDUM OF DECISION FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

TERRY L. MYERS, Bankruptcy Judge.

### BACKGROUND

Kathleen Mary Wegrzyniak ("Debtor") filed for relief under chapter 7. She brings this adversary proceeding seeking a declaration that her student loan obligations are dischargeable under § 523(a)(8). That relief is resisted by Educational Credit Management Corporation ("Defendant"), the successor in interest to the above-named defendants. The matter was taken under advisement at the close of trial on October 1, 1999. This decision constitutes the Court's findings of fact and conclusions of law. Rule 7052.

### APPLICABLE LAW

Section 523(a)(8) provides:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for any obligation to repay funds received as an educational benefit, scholarship or stipend, unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents[.]

■ The critical issue is whether not discharging the debt "will impose an undue hardship on the debtor and the debtor's dependents." The court in *Thomsen v. Department of Education (In re Thomsen)*, 234 B.R. 506, 510 (Bankr.D.Mont. 1999) stated:

The Bankruptcy Code does not define "undue hardship." Courts have held, however, that Congress intended the term to be interpreted strictly, and on a case-by-case basis. *Albert v. Ohio Student Loan Comm'n (In re Albert)*, 25 B.R. 98 (Bankr.N.D.Ohio 1982); *United States v. Brown (In re Brown)*, 18 B.R. 219 (Bankr.D.Kan.1982); *Garmerian v. Rhode Island Higher Educ. Assistance Auth. (In re Garmerian)*, 81 B.R. 4 (Bankr.D.R.I.1987). As the court in *Brown* noted:

It seems universally accepted, however, that "undue hardship" contemplates unique and extraordinary circumstances. Mere financial adversity is insufficient, for that is the basis of all petitions in bankruptcy.

*Brown*, 18 B.R. at 222.

234 B.R. at 510. The Bankruptcy Appellate Panel has agreed, stating in *United Student Aid Funds, Inc. v. Pena (In re Pena)*, 155 F.3d 1108, 1111 (9th Cir.1998):

Neither Congress nor this court has defined the term "undue hardship" in section 523(a)(8)(B). However, "The existence of the adjective 'undue' indicates that Congress viewed garden-variety hardship as insufficient excuse for a discharge of student loans ...." *In re Brunner*, 46 B.R. 752, 753 (S.D.N.Y. 1985) (Aff'd by 831 F.2d 395 (2d Cir. 1987)).

155 F.3d at 1111.

■ As this Court has recently acknowledged,[1] *Pena* requires bankruptcy courts in the Ninth Circuit to apply the undue hardship test announced in *Brunner v. New York Higher Education Services Corp. (In re Brunner)*, 46 B.R. 752 (S.D.N.Y.1985), *aff'd* 831 F.2d 395 (2nd Cir.1987). *Pena*, 155 F.3d at 1111–12, 1114. The *Brunner* test has three parts:

---

**1.** *Bryant v. Wells Fargo Bank (In re Bryant)*, 99.3 I.B.C.R. 118, 119 (Bankr.D.Idaho 1999).

(1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loan.

831 F.2d at 396. The first element requires an analysis of the debtor's current budget. *In re Bryant*, 99.3 I.B.C.R. at 119; *Pena*, 155 F.3d at 1112.

█ The second element requires an evaluation of possible future changes in that budget and the debtor's circumstances. This was explained, in *Brunner*, as follows:

> The further showing required by part two of the test is also reasonable in light of the clear congressional intent exhibited in section 523(a)(8) to make the discharge of student loans more difficult than that of other nonexcepted debt. Predicting future income is, as the district court noted, problematic. Requiring evidence not only of current inability to pay but also of additional, exceptional circumstances, strongly suggestive of continuing inability to repay over an extended period of time, more reliably guarantees that the hardship presented is "undue."

831 F.2d at 396.

█ The third element requires either an effort actually made to repay the loans or a showing "that the forces preventing repayment are truly beyond his or her reasonable control." *Brunner*, 46 B.R. at 755. The efforts are measured by the debtor's efforts to obtain employment, maximize income, and minimize expenses. *In re Roberson*, 999 F.2d 1132, 1136 (7th Cir.1993). The failure to make payments does not preclude a finding of good faith when the debtor never has had the resources to make payments. *Lebovits v.*

*Chase Manhattan Bank (In re Lebovits)*, 223 B.R. 265, 274 (Bankr.E.D.N.Y.1998).

█ The debtor has the burden of proof on all elements. *Bryant*, 99.3 I.B.C.R. at 119; *Bessette v. JDR Recovery Corp. (In re Bessette)*, 226 B.R. 103 (Bankr.D.Idaho 1998), citing *Otto v. Niles (In re Niles)*, 106 F.3d 1456, 1460, n. 3 (9th Cir.1997). *See also, Thomsen*, 234 B.R. at 510.

## FINDINGS OF FACT

Debtor is a 46 years old, recently divorced mother. Her 9 year old son lives with her. She has two other children, a son who turned 18 in February, 1999, and a 20 year old daughter. Neither presently lives with her. The Debtor's 1997 divorce proceeding was contentious and costly, sapping her financial resources.

The Debtor served in the U.S. Air Force from 1971 through 1991, when she retired and received an honorable discharge. Her occupation in the military was in "personnel administration" which the Debtor characterized as involving primarily secretarial work. However, by the time she was discharged, the Debtor had developed carpal tunnel syndrome. She also suffers from a slipped disc aggravated by arthritis. She therefore realized that she needed to develop other job skills in order to make a living and to supplement her military retirement.

She obtained the subject student loans after leaving the military in order to pursue a bachelor's degree and become a school teacher. Most of her course work was done at Boise State University from 1992 through 1995, the year she graduated. She owes $19,121.00 on the subject loans. Servicing this debt would require $228.55 per month over a ten year period.

The Debtor currently works as a school teacher in the Mountain Home School District, and teaches at a middle school. She started with that school district in 1995 as a substitute teacher without contract, and became employed full time in 1996. Her

present salary is $24,000 per year, or $2,000 gross per month. By virtue of a collectively bargained contract, she can expect raises of roughly $1,000 per year, given her present educational background and years of service.

The Debtor has taken some additional classes in order to obtain a master's degree. If she can complete the requirements for that degree, she will move into another pay scale, and receive roughly $2,000 more per year than she will at the present scale. However, her completion of the master's program is in some doubt. She must obtain the agreement of the graduate school offering the program that she has fully paid the tuition for the program even though she has not timely completed the work under the program. If the school disagrees, the Debtor believes that she will be unable to afford any additional tuition charged in order to finish it.[2]

The Debtor teaches under an "annual" contract. Still, she actively teaches only nine months out of the year. She holds no employment during the summer, as a teacher or otherwise. The Debtor indicates that she uses the summer months to work on her classroom curriculum and teaching skills, and to take classes required in order to remain "certified" by the State. However, certification classes are offered year-round, and the Debtor is not required to take them only in the summer.

A primary motivation for the Debtor's lack of a second, summer-time occupation is her desire to commit that time to raising her 9 year old son. In addition to the natural desires of any parent to devote time to her child's upbringing, the Debtor feels a special pressure due to unfortunate circumstances that befell her other two children, especially her 18 year old son, who began using drugs and, in 1998, attempted suicide. She is fearful that lack of contact with and supervision of her younger son could have similar serious repercussions. She is determined in her efforts to prevent that from occurring.

The Debtor also testified that she has eliminated the need for paid child care by her decision to focus solely on teaching. The daily schedules of the Debtor and her son during the school year are similar, though not identical, and the Debtor's 75 year old mother watches the boy after school until the Debtor comes home, and on those occasions when the Debtor takes certification classes on nights, weekends or in the summer. By not having a summer job, there is no need for paid child care for extended periods. The Debtor admits that this situation cannot last indefinitely given her mother's age and health.

The Debtor's present budget is modest. Her monthly income of $2,729.00 is composed of her net salary as a teacher ($1,605.00), her share of military retirement ($419.00) and disability ($434.00) payments, and child support ($271.00). The military payments have recently changed, and may change again[3] and the child support figure reflects a recent decrease due to the older son reaching age 18. The Debtor testified that the child support owed by her ex-husband is being paid. It appears that income from school teaching, military pay, and child support should at least provide the Debtor with $2,690.00 per month for the foreseeable future.

The Debtor's expenses are for the most part unremarkable. They, however, exceed her present net income by something on the order of $137.00 per month. Of these expenses, the Defendant materially questioned only the Debtor's charitable giving. Assuming the Court has discretion to address charitable giving in light of recent amendments to the Code,[4] the bud-

---

2. However, the amount of this possible, additional tuition charge was not provided.

3. These payments will decrease when the Debtor's daughter graduates from college in

December, 1999 and perhaps earlier, but should not drop below $380.00.

4. These amendments expressly effect, for example, § 1325(b)(2)(A) (disposable income re-

get shows only $30.00 per month in this category. This small amount could easily be apportioned among other categories of necessary expenses without pushing those budget categories over the threshold of reasonableness. Her prior charitable dispositions, as evidenced by tax returns, do not require a contrary conclusion, as it appears that a substantial portion of that giving was in non-cash donations of used goods. It does not appear to the Court that this is a case where sizeable charitable giving occurred or is planned at the expense of creditors.

In regard to the subject student loans, the Debtor has not made any payments, nor has she presently obtained a deferment of payment. She testified that she believed she had submitted the paperwork in order to obtain a deferment in 1998, but was uncertain as to its present status.

## CONCLUSIONS OF LAW, AND DISCUSSION

### The first *Brunner* standard

■ While the amount of the payment on the student loans is but $228.00 per month, the Debtor cannot maintain, at the present time, a minimal standard of living if forced to repay those loans. Her present budget,[5] which has a monthly deficit, has no unallocated or discretionary income sufficient to service this obligation.[6]

### The second *Brunner* standard

Whether the Debtor's financial situation is likely to change during the repayment period of the loan revolves, according to the Defendant, around three factors.

### a. Periodic pay increases.

The first factor is that her teaching income, though low, is subject to positive change. So long as the Debtor remains certified and employed,[7] she can expect yearly increases of roughly $1,000.00 per year, or the equivalent of about $83.00 (gross) per month. The Debtor also indicates that discussions between the teachers and her school district on restructuring the contract is an ongoing process.[8]

While her income is unlikely to dramatically increase, the Court concludes there will be some improvement over time. Unfortunately, it appears that most if not all of these increases (which the Court estimates at about 4% per year) are destined to be consumed by increased cost of living. These annual "cost of living adjustments" to the Debtor's teaching salary are not sufficient to support a finding that she will have the ability to repay the student loans.

quirements for chapter 13 confirmation) and § 548(a)(2) (avoidance of transfers to charitable or religious entities.) The amendments do not specifically relate to the Court's consideration of issues under § 523(a)(8). Here the magnitude of the future budget reserved for charities and churches at the potential expense of student loan creditors is *de minimis*. The Court will therefore reserve for another day consideration of the impact of charitable donations on *Brunner's* repayment and good faith requirements.

5. The income side of her present budget is artificially low, given the lack of supplemental summer employment. However, this will be addressed under the second and third parts of the *Brunner* test.

6. Whether her budget is sufficient to partially service the debt is immaterial. *United Student Aid Funds, Inc. v. Taylor (In re Taylor),*

223 B.R. 747 (9th Cir. BAP 1998) rejects the concept of "partial discharge" of student loan debt. *But see, Great Lakes Higher Education Corporation v. Brown (In re Brown),* 239 B.R. 204 (S.D.Cal.1999), reversing 227 B.R. 540 (Bankr.S.D.Cal.1998); *see also, Bryant,* 99.3 I.B.C.R. at 120, n. 2.

7. The Court has assumed the Debtor's employment will continue with the Mountain Home school district. Not only was there no evidence as to what higher salaries, if any, might be obtained in other school districts, the Debtor also testified she had no money available for a move.

8. However, the Court has no way to quantify the potential effect of contract renegotiation, and neither party dwelled on the point. Possible changes to the contract under which she is employed are too speculative to impact the Court's analysis.

## b. Master's degree.

Second, the Defendant correctly observes that a master's degree would yield enough of an increase in the Debtor's salary that payments could probably be made on the student loan debts. Yet, there is insufficient evidence to conclude that the Debtor will in fact obtain that degree. While the Court has little doubt that the Debtor will make every effort to do so (for a host of reasons in addition to the financial ones), she has little control over the tuition issue. The Court is unpersuaded that the graduate degree and concomitant salary increase are sufficiently certain that they should be given much weight in determining the Debtor's future ability to repay.

## c. Summer employment.

Third, the Court must consider the question of the absence of supplemental employment during the summer on the Debtor's present and future income.[9]

The Court finds the Debtor to be sincere and credible in her testimony. She explained her desire to use the summer months to improve her skills, deal with her teaching certification requirements, and raise her son. These are not merely excuses created just to avoid paying the Defendant.

However, it is clear that she could meet her certification requirements at other times of the year. And there is no evidence that the school district would either reward her for efforts over the summer to become a better teacher, or punish her for taking a second, seasonal job.

The Debtor has legitimate reasons for trying to maximize her time with her son, and the Court appreciates that the source of her concern flows in large part from the special circumstances involving her older son. Nevertheless, the Court concludes that the Debtor's desire to spend time with her child instead of working during the summer months is not all that dissimilar from that of parents generally.

Most single parents would like to avoid the financial need to hold a second job, and want to be able to spend more time with their children. Most people in two-parent households would like to avoid the necessity for both spouses to work, so that at least one parent could devote greater time and attention to the needs of their children. Furthermore, the parents in both situations would like to avoid the child care expenses which consume so much of the additional income.

But the unfortunate reality is that such difficult compromises must be made, and that the net supplementary income from a second job or from the other spouse's job is often essential to meeting the financial needs of the family.

The Debtor would like to arrange her teaching and yearly calendars to optimize the quantity and quality of time she could spend with her son. But she hasn't that luxury. The fact of the matter is that the Debtor needs to find summer work to supplement her income. *Accord,* Bryant, 99.3 I.B.C.R. at 120 ("[Debtors] have chosen a profession [as school teachers] which while noble, pays little. To repay their debts, [they] must supplement their income.")

The Court cannot conclude that, in requiring the Debtor to do what so many parents must, she suffers an "undue" hardship. The Court in no sense means to trivialize the traumatic events the Debtor and her children have suffered, nor minimize her sincere and reasonable desire to avoid problems with her youngest son. Her dedication to her family is laudable, as is her dedication to public education.

But the standards guiding the Court require, if the debt is to be discharged, a conclusion that financial circumstances

---

9. As noted above, this issue relates also to the Debtor's present ability to pay under the first *Brunner* test. And as discussed below, it impacts the good faith requirement of *Brunner's* third prong.

prohibiting the present payment of the debt will inevitably continue through a substantial portion of the repayment period of the student loans. I cannot do so on this record. While certain occupations are not available to the Debtor, due to her medical conditions, there was no showing that the Debtor could not obtain reasonable employment over the summer months [10] without compromising her employment, her certification requirements, or unduly compromising her need to spend time with her son.

The Court is unable to conclude that the Debtor has sustained her burden on this aspect of the *Brunner* test, and to prove that future net income from teaching and supplementary employment would still be insufficient to service the obligation.

### The third *Brunner* standard

The Court concludes that the Debtor's past failure to make payments on these obligations to date is not indicative of a lack of good faith. The financial, medical and familial problems encountered in the past two years are adequate justification for the absence of those payments.

■ However, under this third part of the test, good faith efforts have a prospective import as well as a retrospective one. Not only must the prior treatment of the student loan creditors be in good faith, as evidenced by payments or a showing that forces beyond the debtor's reasonable control prevented payment, the debtor's affairs must be analyzed prospectively to see if those conditions will continue. The Debtor's efforts are "measured by his or her efforts to obtain employment, maximize income, and minimize expenses." *Roberson*, 999 F.2d at 1136.

■ As with the second part of the *Brunner* test, the Debtor's need to have some sort of appropriate summer employment is relevant here. The Court cannot find that, in the absence of seeking that employment, the Debtor is making a good faith effort to repay the debt.

The Court concludes that the third prong of the test has not been fully satisfied.

### CONCLUSION

Congress has seen fit to erect a high hurdle to debtors seeking to discharge student loan obligations. While it commits to the Court's discretion the finding of "undue hardship," that discretion has been circumscribed by case law which, in an attempt to give structure to the Congressional enactment, reserves discharge for the extraordinary case. The Debtor has failed to meet her burden of showing that she falls within that limited category.

Based upon the foregoing, judgment will be entered in favor of the Defendant holding the subject debt non-dischargeable. Counsel for the Defendant shall prepare a form of judgment in accord herewith.

■

---

10. Several assumptions could be made regarding the types of jobs available to the Debtor and the wages potentially obtainable over the months she is not actively teaching. Various assumptions could also be made as to the cost of child care. Both subjects must be considered in order to arrive at a projected net income to be generated from summer employment. No doubt scenarios could be suggested showing such income would be sufficient to pay the Defendant, while others would support a contrary conclusion. But no evidence as to employment alternatives, wages, or child care costs, or projections of realizable net income were offered. As the Debtor bears the burden of proof, the absence of evidence as to her potential net summer income is critical. *Cf., Markley v. Educational Credit Management Corp. (In re Markley)*, 236 B.R. 242, at 245, 248 (Bankr.N.D.Ohio 1999) (evidence established that net income from second job provided only slight financial benefit, and did not outweigh detrimental impact on the debtor; the effort to earn income from that second job was also material to a finding of debtor's good faith under the third *Brunner* standard. )