**In re John Howard LEWIS and Jerrie Leann Lewis, Debtors.**

**Jerrie Leann Lewis, Plaintiff,**

v.

**Illinois Student Assistance Commission, Defendant.**

**Bankruptcy No. 96–82697.
Adversary No. 00–8167.**

United States Bankruptcy Court, C.D. Illinois.

March 27, 2002.

James S. Brannon, Peoria, IL, for plaintiff.

David J. Hershman, Chicago, IL, for defendant.

### OPINION

THOMAS L. PERKINS, Bankruptcy Judge.

Before the Court is the adversary complaint filed by JERRIE LEANN LEWIS, the Debtor (DEBTOR) against ILLINOIS STUDENT ASSISTANCE COMMISSION (ISAC), to determine whether her student loan should be discharged as an undue hardship.

### FACTUAL BACKGROUND

The DEBTOR is forty-six years old and is a high school graduate. She married at age eighteen and had six children between 1973 and 1984. She divorced her first husband, with whom she had three children, in the late 1970's. He never paid child support. Her second husband was chronically unemployed and provided little financial support for the family. In the early 1980's, in an effort to improve her own earning power, the DEBTOR obtained a $5,000.00 student loan to attend junior college. She took classes between 1982 and 1984 but dropped out before obtaining an associate's degree.

In 1985, the student loan first became payable in payments of $50.00 per month. The DEBTOR requested and obtained a deferral for a period of time. After the deferral expired, the DEBTOR made some payments although she was not able to remain current on the debt. The source of the payments was the DEBTOR'S employment, usually part-time, minimum wage jobs. The DEBTOR struggled financially throughout the 1980's.

In October, 1990, the student loan was restructured and transferred to the Illinois Designated Account Purchase Program ("IDAPP"). The DEBTOR signed a "Loan Consolidation Application and Promissory Note" and a "Loan Consolidation Disclosure Statement and Payment Schedule." As indicated in these documents, a single student loan to First of America Bank was paid off in the amount of $6,192.01.[1] This amount was then amor-

1. Although there is no evidence in the record that the DEBTOR had more than one student

tized over ten years, at nine percent (9%), with monthly payments of $78.44 beginning December 29, 1990, and the final payment due November 29, 2000. Within a year, with her husband then in jail, the DEBTOR was forced to request a forbearance and extension, which was granted. The lender agreed to forbear interest and monthly payments until August 29, 1991. The monthly payment amount was increased slightly to $79.21, with the final payment extended to April, 2001.

On May 19, 1992, the DEBTOR filed an individual petition under Chapter 7 and converted to Chapter 13 on August 11, 1992. At that time she was employed as a registrar at St. Francis hospital making $14,000.00 per year with take home pay of $814.00 per month. She had earned $13,000.00 in 1990 and 1991. She was still married to her second husband, but he was unemployed. According to her bankruptcy schedules, the DEBTOR'S monthly living expenses exceeded her take home pay by $400.00. A Chapter 13 Plan was confirmed but the DEBTOR was unable to make her monthly payments of $100.00 to the Chapter 13 Trustee and her case was dismissed in July, 1994. ISAC filed an unsecured claim in the amount of $6,623.03, but received no distribution.

The DEBTOR divorced her second husband in 1994 and remarried. She and her third husband filed their joint Chapter 13 case on September 9, 1996. The DEBTOR was then working as a nail technician at a beauty salon earning $1,000.00 gross per month, taking home $800. Their plan was confirmed in January, 1997, but they were unable to make the required payments and converted to Chapter 7 in March, 1999. Their Chapter 7 discharge was entered in July, 1999. ISAC filed a proof of claim alleging a balance on the student loan debt of $10,397.99 as of the petition date of September 9, 1996, but again received no distribution.[2]

The DEBTOR divorced her third husband in 1998. She changed jobs that same year, becoming employed as a legal assistant with a Peoria law firm. Her position was full time until 2000 when, because of the illness of the attorney for whom she worked, her hours were reduced to part-time. She now works at the firm approximately 15 hours per week, making $9.79 per hour. She supplements her income by tending bar one night a week earning about $80.00. The DEBTOR is a breast cancer survivor and receives health insurance through the law firm. She has sought other full-time employment, but has found that she would be uninsurable if she switched jobs, so she has remained at the law firm to maintain her health insurance coverage. She hopes that her hours will be increased again in the future.

After the 1990 restructuring, the DEBTOR made only one payment of $83.65 to IDAPP, who serviced the loan until May 1, 1992, when ISAC assumed servicing responsibilities. She has made only one payment of $60.00 since ISAC took over.

On December 22, 2000, the DEBTOR filed this adversary complaint against ISAC to determine the dischargeability of the student loan. A trial was held on

---

loan, the DEBTOR conceded that her debt was "consolidated" in 1990, and the Court will therefore assume that the restructured loan is a federal consolidation loan pursuant to 20 U.S.C. § 1078–3.

**2.** Both the modified plan and the confirmation order provided that the DEBTOR'S debt to ISAC would be discharged under Section 523(a)(8). Because the case was dismissed, the DEBTOR never received a discharge. The DEBTOR does not contend that the confirmation order alone has any effect on her liability to ISAC.

October 30, 2001. At the time of the hearing, the DEBTOR was receiving $148.00 every two weeks in child support for her seventeen-year old son, her only child still at home, but it was the DEBTOR'S understanding that her son's father was going to jail in the near future and those payments would cease.

The DEBTOR lives with her son in a house owned by her sister. She is not currently paying rent, although her sister expects her to at some future point when she is able to afford it. She will be responsible for payment of the utilities, but she is unsure of their amount because she just recently moved in. Her monthly expenses also include a car payment of $373.00 for a 1997 Jeep; car insurance of $69.00; groceries of $400.00; telephone of $35.00; gas of $65.00; clothing for her son of $100.00; lunch money for her son of $66.00; and medical expenses for herself of $101.00. She testified that her son has been on Ritalin since he was in the fourth grade but she cannot now afford the $60.00 per month cost. Given his difficulties in school, he will remain in high school for the next two years. She testified that she never spends any money on herself or her home.

### ANALYSIS

In order to obtain a discharge of a student loan as creating an undue hardship on the debtor or the debtor's dependents, the Seventh Circuit Court of Appeals requires the debtor to demonstrate:

1. That the debtor cannot maintain, based on current income and expense, a "minimal" standard of living for [himself] and [his] dependents if forced to repay the loans.

2. That additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans.

3. That the debtor has made good faith efforts to repay the loans.

*Matter of Roberson,* 999 F.2d 1132 (7th Cir.1993) (adopting the three-part test set by the Second Circuit in *Brunner v. New York State Higher Educ. Services Corp.,* 831 F.2d 395 (2d Cir.1987), the *"Brunner* test").

### 1. Current Inability to Repay.

■ Under the first prong, the DEBTOR must show that she cannot maintain, based on current income and expenses, a minimal standard of living for herself and her dependents if she is forced to repay the student loan. In making this analysis, the Court must first evaluate the DEBTOR'S present standard of living based upon her lifestyle attributes which appear from the record and then determine whether the forced repayment of the student loan obligation will preclude the DEBTOR from maintaining a minimal standard of living. *In re Barron,* 264 B.R. 833 (Bankr.E.D.Tex.2001).

■ Assuming that the DEBTOR receives the maximum child support she is entitled to, her monthly expenses of $1,239.00 exceed her monthly income of $1,304.00, when a reasonable sum for rent and utilities is taken into account. If her son's father is incarcerated and she loses that source of assistance, her net monthly income falls to $983.00. But for the generosity of her sister, the DEBTOR would be unable to make ends meet. While conceding that requiring the DEBTOR to repay the loan may be a current hardship, ISAC suggests that the DEBTOR could have purchased a less expensive vehicle than the 1997 Jeep Wrangler which she bought after the filing of the Chapter 13 petition in 1996, and had she done so, she could have devoted the difference of $175.00, more or less, to payments on her student loan.

In support of its position that the DEBTOR'S automobile expenses are excessive, ISAC relies on several cases where the debtor's purchase or desire to purchase an automobile was given considerable attention by the court. Because the determination of "undue hardship" is so closely tied to the facts of each particular case, however, previously decided cases are ordinarily of little value. The Court has examined the cases relied upon by ISAC and each is sufficiently distinguishable on its facts.[3] The DEBTOR purchased the 1997 Jeep Wrangler in 1998 for $15,000.00. The vehicle is now five years old and has 59,000 miles on it. The DEBTOR still owes about $10,000.00 on the secured loan. The DEBTOR is entitled to spend a reasonable amount for the cost of owning an automobile, and while her car payments of $373.00 per month may be at the high end of the range regarded as reasonable, given her otherwise frugal lifestyle and budget shortfalls, this Court, viewing the DEBTOR'S expenses as a whole, finds that the DEBTOR would not be able to maintain a minimal standard of living for herself and her son if forced to repay her student loan.

## 2. Future Inability to Repay.

■ Under the second prong of the *Brunner* test, the DEBTOR must establish that her inability to pay will likely continue for a significant portion of the repayment period of the student loan. The original repayment term of the student loan that began in 1985 has long expired. The extended repayment term of the restructured loan has also expired, in April, 2001. This expiration alone may be sufficient to satisfy *Brunner's* second prong. Regardless, a consideration of the DEBTOR'S future prospects is of no help to ISAC'S position.

■ Unfortunately, the additional, uncompleted education that the DEBTOR received with the assistance of her student loan has not increased her earning ability and will not help her earn more in the future. While a student loan lender is not a guarantor of a borrower's ability to earn more based on additional education, the lack of benefit of an uncompleted junior college program is properly taken into account in the analysis of *Brunner's* second prong. *See, Matter of Roberson,* 999 F.2d 1132, 1135–36 (7th Cir.1993). The DEBTOR has been in bankruptcy for much of the past decade. Her ability to deal with her financial problems, including the student loan, is no better now than when she started. The evidence indicates that she does not and will not have the capacity to "earn" her way out of these straits.

ISAC does not suggest that the DEBTOR'S education will enable her to obtain a

**3.** *In re Faish,* 72 F.3d 298 (3d Cir.1995), the debtor held a Master's Degree and although the bankruptcy court determined that both her current income and future employment and income prospects were good, and concluded that she had the ability to repay the loan without falling below the subsistence level, a portion of the loan was determined to be dischargeable in order to permit the debtor to save for the purchase of a vehicle and a move to a better apartment. Affirming the district court's reversal of that decision, the court adopted the *Brunner* test, and based upon a comparison with the debtor's circumstances in that case, held that the debtor's financial difficulties were far less severe and that she could repay her student loan with "short-term, belt-tightening." 72 F.3d at 307. Similarly, the court in *Perkins v. Vermont Student Assistance Corp.,* 11 B.R. 160 (Bankr.D.Vt. 1980), determined that the debtor could afford to make the requested minimal monthly payments of $20.00 on her student loan, even though her budget was tight. In so holding, the court condemned the debtor's recent purchase of a Ford Pinto wagon which required monthly payments of $169.00, characterizing the vehicle's purchase as a "self-imposed hardship."

better paying job, but contends that the DEBTOR should look for additional work to increase her income. The DEBTOR has remained at her current job at the law firm in order to maintain her health insurance coverage, which is understandable and reasonable. While she is hopeful that her hours will be increased, she has been given no assurances. Given the DEBTOR'S level of skill and her past employment history, it is most unrealistic that the DEBTOR will receive sufficient increases in income which would permit her to make meaningful payments on her student loan. If she were to return to full-time, forty (40) hour per week status at the law firm, her gross income would barely support her current modest lifestyle when reasonable amounts for rent, utilities and medicine for her son are added to her expenses. Even so, there is no evidence that this is likely to occur any time soon. Based on the evidence received at trial, and in light of the fact that the repayment term of the student loan has completely elapsed, the Court concludes that the second prong of the *Brunner* test has been met.

### 3. Good Faith Efforts to Repay.

 ISAC'S primary focus is on the third prong of the *Brunner* test, which requires the DEBTOR to demonstrate that she has made a good faith effort to repay the loans, measured by her efforts to "obtain employment, maximize income, and minimize expenses." *Roberson*, 999 F.2d at 1136. With respect to this prong, ISAC offers a somewhat curious argument. Since the original student loan obtained in the early 1980's, was "consolidated" in 1990, says ISAC, the

only payments that the Court may consider for purposes of *Brunner's* third prong are the two payments totaling $143.65 made post-consolidation; any and all pre-consolidation payments are irrelevant. It makes no difference, says ISAC, how old the original loan is, and neither how many nor what amount of payments the borrower made prior to consolidation.[4]

Characterizing it as the "leading case on point," ISAC relies upon *In re Saburah*, 136 B.R. 246 (Bankr.C.D.Cal.1992). Interpreting the prior version of Section 523(a)(8), the court in *Saburah* held that a consolidation loan "first became due," for purposes of former subsection (a)(8)(A), upon the initial due date of the new, consolidated loan, not when the original loans first became due prior to consolidation. In so holding, relying primarily on the language of subsection (a)(8)(A), no longer in effect, the court rejected the Department of Education's reliance on the federal statute dealing with consolidation of student loans, as follows:

The DOE argues that 20 U.S.C. Sections 1078–3(d) (footnote omitted) and 1074 operate to change the starting date of the period under 11 U.S.C. § 523(a)(8)(A). While it is true that Section 1078–3(d) identifies the loans as new, the language of Sections 1078–3(d) and 1074 involve the ability of the federal government to insure a student loan. 20 U.S.C. Sections 1078–3(d) and 1074 do not reference 11 U.S.C. § 523(a)(8)(A). Thus, though these statutes may inferentially support the gov-

---

4. ISAC'S argument is curious since, in other cases, it could work against it. Query whether ISAC would accept its own "new loan" theory if a borrower made no payments on a student loan for ten years, then after consolidation, made regular payments for several months before filing bankruptcy. If consideration of payments made pre-consolidation is to be excluded, so must consideration of a history of pre-consolidation non-payment be excluded.

ernment's position, they are weak and certainly not conclusive authority. *In re Saburah*, 136 B.R. at 251.

The "new loan" theory posited by ISAC here, is founded upon the same federal statute dealing with consolidation of student loans. The *Saburah* court clearly recognized the attenuated nature of applying an unrelated statutory characterization, with a non-bankruptcy purpose, of a consolidation loan as a new loan, to a Bankruptcy Code nondischargeability provision. The provision for discharge of student loans that first became due more than seven years prior to the filing, contained in former Section 523(a)(8), and upon which *Saburah* is premised, has now been eliminated. ISAC nevertheless seeks to apply the same statutory characterization to the third prong of the *Brunner* test which makes no reference to when the loan "first became due." Like a salt water taffy pull, at some point the connection is stretched so thin that it snaps. That point has been reached here with respect to ISAC'S position.

ISAC also relies upon *Hiatt v. Indiana State Student Assistance Com'n*, 36 F.3d 21 (7th Cir.1994). Like *Saburah, Hiatt* construed the effect of consolidation on commencement of the seven-year period of former Section 523(a)(8), and is distinguishable for the same reasons. The other case cited by ISAC, *In re Lapusan*, 244 B.R. 423 (Bankr.S.D.Ill.2000), actually supports the DEBTOR. In *Lapusan*, the DEBTOR sought to use a prior consolidation of five student loans as a shield, arguing that the consolidation loan was not an "educational loan" for purposes of Section 523(a)(8) since its purpose was merely to obtain better payment terms, not to pay for schooling. Judge Kenneth Meyers rejected this position, holding that a consolidation loan, despite its restructuring purpose, is an educational loan that is

nondischargeable under Section 523(a)(8), reasoning that:

> [N]othing changed about the nature of the debt upon consolidation except that Mr. Lapusan received better payment terms. The loan simply paid off Mr. Lapusan's original student loans to his benefit. Since it is clear that the essential purpose of the loan was the restructuring of debt incurred to pay the costs of higher education, the consolidated loan can only be characterized as an educational debt that is nondischargeable under § 523(a)(8).

244 B.R. at 425.

The same reasoning is applicable here to defeat ISAC's attempt to use the prior consolidation as a sword. The consolidation did nothing to change the nature of the debt or the fact that the DEBTOR had been struggling to pay it for the previous five years. In this Court's opinion, the act of consolidating student loans for the purpose of restructuring the payment terms should be used neither as a shield by the borrower nor a sword by the lender. While consolidation had a justifiable, substantive effect under the seven-year rule contained in the previous version of Section 523(a)(8), it no longer has such an effect under the current provision and should not play a determinative role in the *Brunner* analysis.

■ Apart from the fact that the holdings in *Saburah* and *Hiatt* are not applicable to the present version of Section 523(a)(8), ISAC'S position is also contrary to one of the fundamental policies underlying the *Brunner* test, i.e., that, all else being equal, the older the loans are, the more readily they will be discharged. This temporal element is overtly apparent in *Brunner's* second prong, which limits the predicted future inability to pay to a "significant portion of the repayment period of the student loan."

It is also implicit in *Brunner's* third prong. Although seldom mentioned, the *Brunner* test was actually developed by the district court in *In re Brunner,* 46 B.R. 752 (S.D.N.Y.1985). Discussing the good faith element, the district court linked it to the purpose behind Section 523(a)(8), "to forestall students, who frequently have a large excess of liabilities over assets solely because of their student loans, from abusing the bankruptcy system to shed these loans." *Id.* at 755. Reversing the bankruptcy court's decision to discharge the debtor's student loans on the basis of undue hardship, the district court held that the debtor failed to demonstrate a good faith attempt to pay the loans because:

1. She filed for bankruptcy relief within one month of the date the first loan payment came due.

2. She made no attempt to repay the loans.

3. She did not request a deferment.

*Id.* at 758. The Second Circuit affirmed for the same reasons. 831 F.2d 395, at 397. By the time the circuit court issued its opinion, almost five years had passed since the debtor's bankruptcy filing and the court, at the conclusion of its opinion, suggested that the debtor might reopen the issue of the dischargeability of her student loans based on her current circumstances. *Id.* at 397. This suggestion is a clear statement of the importance of the passage of time to the dischargeability of student loans.[5]

Thus, while time alone is no longer a basis for discharge of a student loan, it remains an important factor in this determination. The presumptive nondischarge-ability of student loans was never meant to be a permanent millstone around the debtor's neck. Other courts have rejected the argument that ISAC makes here, that consolidation creates a new loan and precludes consideration of pre-consolidation payments for purposes of *Brunner's* third prong, and have found that a history of pre-consolidation payments evinces a good faith effort to repay. *In re Nary,* 253 B.R. 752, 768–69 (N.D.Tex.2000); *In re Peel,* 240 B.R. 387, 395–96 (Bankr.N.D.Cal. 1999).

By attempting to restart the clock, thereby depriving the debtor of the benefit of the passage of time and of her pre-consolidation payments, ISAC'S "new loan" theory is contrary to the intent behind Section 523(a)(8) and the *Brunner* test, and must be rejected. This Court holds that the restructuring of the student loan that occurred in 1990 in the form of a "consolidation" does not preclude consideration of the payments made prior thereto, for purposes of determining whether the DEBTOR made a good faith effort to repay the loan.

Turning now to the evidence, the DEBTOR'S testimony that, after obtaining a deferment, she made several payments on her student loan before the consolidation was not refuted. Shortly after consolidation, the DEBTOR obtained a fifteen-month deferment. Because of her bankruptcy filings, the DEBTOR spent the majority of the time from May, 1992, through July, 1999, under the protection of the bankruptcy court. That fact is significant because, during that time, the Chapter 13 plans did not provide for any payments to

---

5. Likewise, the 7th Circuit, in *Roberson,* approving a two-year deferment of the debtor's obligation to make payments on the student loan, suggested that, if his circumstances had not improved in two years, the debtor could reopen his bankruptcy case to have the dischargeability issue revisited. 999 F.2d at 1138. And where a debtor files a new bankruptcy petition, the dischargeability of his student loan will be considered *de novo,* notwithstanding the prior determination of nondischargeability. *See,* 11 U.S.C. § 523(b).

ISAC on her student loan, an unsecured, non-priority debt, and any payment the DEBTOR would have made outside the plan would have, in fact, been improper. It is also apparent from an examination of those proceedings that the DEBTOR'S earnings were minimal throughout this period. During the first Chapter 13 proceeding, the DEBTOR'S husband contributed no earnings to fund the plan. At that time, the DEBTOR was the sole source of support for her large family.

When the DEBTOR and John Lewis filed the second Chapter 13 proceeding, they were represented by counsel and in good faith believed that the DEBTOR'S student loan was discharged.[6] Again, no distributions were made to unsecured creditors.[7] The 1997 Jeep Wrangler was purchased used in 1998, at a time when she may have had no other means of transportation. Throughout this entire period, the DEBTOR simply lacked the ability to make any payments on her student loan, and her failure to do so does not evidence lack of good faith. She has continually worked to support her family, not always meeting, but never exceeding a minimal standard of living.

Unlike the debtor in *Brunner*, who filed bankruptcy one month after the student loan first became due, the DEBTOR'S first filing was seven years after her student loan first came due. This is not at all a case where the DEBTOR'S heels were greased and she slid into bankruptcy at the earliest opportunity. Unlike the debt-

or in *Brunner*, who made no attempt to repay the loans, the DEBTOR made payments, off and on, through 1991, until she was forced to seek bankruptcy protection. Unlike the debtor in *Brunner*, who never requested a deferment, the DEBTOR requested and obtained two deferments as well as a complete restructuring of the obligation.

The student loan originally came due seventeen years ago. The "consolidation" itself occurred twelve years ago. It is time for this grey-beard loan to unhand the DEBTOR.[8] This Court finds that the DEBTOR has satisfied all three prongs of the *Brunner* test and the debt to ISAC is dischargeable under the undue hardship discharge provision of § 523(a)(8).

This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate Order will be entered.

### *ORDER*

For the reasons stated in an Opinion filed this day, IT IS HEREBY ORDERED that the consolidated student loan debt owed by JERRIE LEANN LEWIS to ILLINOIS STUDENT ASSISTANCE COMMISSION is hereby discharged pursuant 11 U.S.C. § 523(a)(8).

---

**6.** ISAC did file a letter along with its proof of claim, stating its position that the loan was not dischargeable. However, there is no indication in the file that a copy of the letter was served on the DEBTOR or her attorney and the DEBTOR would not necessarily have been aware of the letter.

**7.** ISAC did not object to confirmation of the plan in either of the DEBTOR'S two Chapter

13 cases and it appears that the DEBTOR was using what little disposable income she had to fund the plans.

**8.** In Samuel Taylor Coleridge's *Rime Of The Ancient Mariner*, the wedding guest protests the old Mariner's stopping him: " 'Hold off! unhand me, grey-beard loon!' Eftsoons his hand dropt he."