**In re Deanna C. ORDAZ, Debtor.**

**Deanna C. Ordaz, Plaintiff,**

v.

**Illinois Student Assistance Commission, Defendant.**

**Bankruptcy No. 01–83723.
Adversary No. 01–8288.**

United States Bankruptcy Court, C.D. Illinois.

Dec. 23, 2002.

James S. Brannon, Peoria, IL, for Plaintiff.

David J. Hershman, Chicago, IL, for Defendant.

## OPINION

THOMAS L. PERKINS, Bankruptcy Judge.

This matter is before the Court after trial on the adversary complaint filed by the Debtor, Deanna C. Ordaz (DEBTOR), against the Illinois Student Assistance Commission (ISAC), seeking a determination that excepting her student loan from discharge would impose an undue hardship on her and her dependents under § 523(a)(8) of the Bankruptcy Code. The issues include the effect of a consolidation note entered into for the purpose of restructuring the delinquent student loan. This Court previously held in *In re Lewis*, 276 B.R. 912 (Bankr.C.D.Ill.2002), that a consolidation note does not preclude consideration of pre-consolidation payments for the purpose of determining whether the debtor made good faith efforts to repay the student loan under the third prong of the *Brunner* test. Today, addressing the second prong of that test, the Court holds that a consolidation note that merely restructures the payment terms does not restart the clock for the purpose of determining whether the debtor's inability to pay is likely to persist "for a significant portion of the repayment period of the student loans." Rather, the term of the consolidation loan, like the term of the original loan, is merely one factor in the totality of the circumstances to be evaluated in determining whether undue hardship exists.

## FACTUAL BACKGROUND

The DEBTOR is thirty-five years old and was divorced in 2000. She has a three-year-old son and, at the time of trial, was pregnant by her ex-husband. She is presently unemployed. In 1988, the DEBTOR applied for and obtained a guaranteed student loan to finance her junior and senior years at Bradley University. She earned a Bachelor of Science degree in elementary education in May, 1990. Approximately nine months later, in February, 1991, the first loan payment came due. The total amount of the loan was $7,800.00, which, amortized over ten years at ten percent (10%) interest, required loan payments of $103.00 per month.

Upon graduation, the DEBTOR began working at a day care facility, making $4.50 to $5.00 per hour. She left that job after a year to work at a minimum wage job in another field, which she also held for a year. During that two-year period following graduation, the DEBTOR obtained her state teaching certificate and did some substitute teaching, but she found it too sporadic to rely on. From 1994 to 1999, she worked at another day care facility, advancing to the position of director, making $8.68 per hour. As the director, the DEBTOR was required to cover for other workers when they were absent and, in 1999, found that she was spending too many hours away from her infant son, prompting her to take a position in a different day care facility, where she earned the same rate of pay. In 2000, the DEBTOR left that job to work at yet a different facility, earning $10.50 per hour, quitting this position in April, 2001, over concerns about numerous violations of DCFS regulations. She has been unemployed since April, 2001.

Between 1991 and 1998, the DEBTOR made thirteen payments on the student loan, totaling $1,781.00, to Southwest Student Services Corporation (SSSC). By June, 1998, the loan was substantially in arrears, with a balance in excess of $13,000.00. On June 12, 1998, the DEBTOR signed a printed form entitled "Loan Consolidation Application and Promissory Note." On July 22, 1998, a printed form entitled "Loan Consolidation Verification Certificate" was signed by Yvette West,

who was not identified at trial, but who appears to be a representative of the lender. These documents, admitted without objection, evidence a restructuring of the student loan that capitalized the balance of $13,423.90 and amortized it over 180 months with interest at 8.25%, yielding a level payment of $130.23 per month, with the first payment due September 27, 1998. The DEBTOR testified that she believed she made a few more payments after the loan was restructured, but acknowledged that she had no documents to corroborate this assertion, which ISAC disputes.

The DEBTOR filed a Chapter 7 bankruptcy petition on August 29, 2001. According to her schedules, the DEBTOR earned $15,843.00 in 1999, $17,119.00 in 2000, and $7,500.00 in 2001. The DEBTOR scheduled nonpriority, unsecured claims, including her student loan in the total amount of $26,020.00. Her only secured claim was for a 1998 Pontiac Grand Am, which she did not reaffirm. Her Chapter 7 case was a no-asset case and she received a general discharge on December 3, 2001. On October 19, 2001, the DEBTOR filed this complaint to determine the dischargeability of her student loan. The DEBTOR was the only witness to testify at the trial held on August 6, 2002.

The DEBTOR testified to monthly expenses of only $515.00. Those expenses include: rent, including utilities $400.00; phone $60.00; food $30.00; and miscellaneous supplies $25.00. The DEBTOR receives $248.00 per month in food stamps. She receives $309.00 for current child support each month and $100.00 in payment of past-due child support and medical reimbursement. The DEBTOR has no vehicle and she has less than $100.00 in her savings account. Her only other assets, according to her schedules, are household goods and furnishings valued at $200.00, clothing valued at $200.00, and an IRA worth $199.00.

### ANALYSIS

■ A student loan is not dischargeable in bankruptcy unless "excepting such debt from discharge ... will impose an undue hardship on the debtor and the debtor's dependents." 11 U.S.C. § 523(a)(8). The Bankruptcy Code does not define "undue hardship," but the Seventh Circuit has adopted the Second Circuit's three-pronged *Brunner* test for evaluating such a claim. *Goulet v.Educational Credit Management Corp.*, 284 F.3d 773, 777 (7th Cir.2002). Under the test, the debtor must demonstrate, by a preponderance of the evidence:

1. That he cannot maintain, based on current income and expenses, a minimal standard of living for himself and his dependents if forced to repay the loans;

2. That additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and

3. That the debtor has made good faith efforts to repay the loans.

*Matter of Roberson*, 999 F.2d 1132 (7th Cir.1993)(adopting the three-part test set by the Second Circuit in *Brunner v. New York State Higher Educ. Services Corp.*, 831 F.2d 395 (2d Cir.1987), the *"Brunner* test"). If the debtor fails to establish any one of the elements, the test has not been met and the court need not continue with the inquiry. *Roberson*, 999 F.2d at 1135.

### 1. Current Inability to Repay.

■ In order to satisfy the first prong of the *Brunner* test, the DEBTOR need only show that she does not have the present ability to repay her student loan and maintain a minimal standard of living

for herself and her dependents. The first step to be taken by the Court in making this determination is to evaluate the DEBTOR'S present standard of living based upon her lifestyle attributes which appear from the record. Second, the court must determine whether forced repayment of the student loan will preclude her from maintaining a minimal standard of living. *In re Barron,* 264 B.R. 833 (Bankr. E.D.Tex.2001).

A debtor with no income clearly satisfies this test. Here, the DEBTOR is welfare-dependent and has no income other than child support. Those monies must be used by the DEBTOR for her son's benefit, not to repay her student loan. She has no means of transportation, and is only able to use her mother's car or her former husband's car, when necessary. The DEBTOR'S current financial situation goes beyond one of just "tight finances." Her lifestyle, at the present time, is lacking in the basic necessities. The first prong of the *Brunner* test is satisfied.

## 2. Future Inability to Repay.

 To satisfy the second prong of the *Brunner* test, the DEBTOR must prove that, because of additional, exceptional circumstances, her inability to pay is likely to continue for a significant portion of the repayment period of the loan. The application of this second prong in light of the 1998 loan restructuring is at the heart of the dispute between the parties. Because restructuring of delinquent student loans is now a common occurrence, resolution of this issue is of wide-ranging signifi-

cance. Since the original ten-year term of the loan expired as of February, 2000, the DEBTOR contends that *Brunner's* second prong has, *ipso facto,* been met. ISAC asserts that the 1998 restructuring and extension, which it characterizes as a "consolidation," triggered a new repayment period lasting until 2013, based upon a fifteen-year amortization. ISAC argues that the DEBTOR has failed to prove that her inability to pay is likely to persist for a significant portion of this new, extended repayment period.

In August, 1998, when the student loan was restructured, the DEBTOR signed a "Loan Consolidation Application and Promissory Note." This document indicates that a single student loan was paid off in the amount of $13,423.90, with the accrued interest capitalized and the balance amortized over fifteen years, with interest at 8.25%. Although the amount of the monthly payment is not shown on the note, amortizing the loan on those terms yields a level payment amount of $130.23 per month. The evidence also indicates that SSSC was the holder of the loan prior to the restructuring and continued to hold it after the restructuring through the date of the bankruptcy filing.[1] The loan was not assigned to ISAC until October 29, 2001, after the filing.[2] No new money was advanced when the loan was restructured.

For the first twenty years of the Bankruptcy Code's existence, the student loan nondischargeability provision was divided into two alternative subsections. The general rule, stated in subsection (A), was that student loans were nondischargeable for

---

1. The parties stipulated that the DEBTOR'S loan payments made from 1991 to 1998 were made to SSSC. SSSC filed its proof of claim on October 31, 2001, asserting that it was owed a balance of $15,036.65 on the restructured loan as of the date of the bankruptcy filing.

2. ISAC filed its own proof of claim for the student loan on December 17, 2001, for the slightly higher amount of $15,207.39, attaching a copy of the "Lender's Guarantee to the Illinois Student Assistance Commission" dated October 29, 2001.

five years. After five years, they were automatically dischargeable based on the passage of time alone. A 1991 amendment lengthened that term to seven years. An exception to the general rule was provided in subsection (B) for those debtors whose financial situation was so dire that they could not hold out until the five (then seven) years elapsed without experiencing undue hardship. Through amendatory legislation effective October 7, 1998, Congress amended Section 523(a)(8) to delete subparagraph (A), leaving undue hardship as the sole basis for discharging a government insured student loan.[3]

ISAC's insistence that the 1998 restructuring constituted a "consolidation" loan,[4] and its view of the significance of that characterization, emanates, primarily, from its reliance upon *Hiatt v. Indiana State Student Assistance Commission*, 36 F.3d 21 (7th Cir.1994), a case construing the prior version of the statute containing the seven-year rule, which provided:

> (A) such loan, benefit, scholarship or stipend overpayment first became due more than 7 years (exclusive of any applicable suspension of the repayment period) before the date of the filing of the petition; or

> (B) excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents.

In *Hiatt*, the debtor had consolidated several student loans into a single consolidation loan and the issue was whether, under this former version of the statute, the seven-year automatic nondischargeable period of Section 523(a)(8)(A) began to run when the original loans first became due or, later, when the consolidation loan first became due. Construing the language of the statute, the court held that the term "such loan," as used in Section 523(a)(8)(A), refers to the consolidation loan. Since the bankruptcy case was commenced within seven years of the date the consolidation loan first became due, the loan was not dischargeable under Section 523(a)(8)(A). Undue hardship was not at issue in *Hiatt*.

In light of the 1998 amendment, *Hiatt*, and other similar opinions, construing statutory language that has been deleted, are of no precedential value. Moreover, since "undue hardship" is not defined in the statute, the issue is no longer one of construing the language of the statute, but, rather, is one of construing the meaning of the second prong of the common law *Brunner* test. Specifically, should the inquiry focus on the repayment period of the original loan or of the restructured note, or should the inquiry be limited at all to either loan term? To answer these questions, the Court will look to the history of and purpose behind the undue hardship provision itself as well as that of the *Brunner* test.

---

**3.** The amendment was passed as part of the Higher Education Amendments of 1998, Pub. L.No. 105–244, § 971(a) (1998). What Congress was thinking in 1998 when it deleted subparagraph (A) remains a mystery, as the amendment was made without reported legislative history.

**4.** Consolidation of federally insured or guaranteed student loans is permitted, if certain conditions are met, pursuant to 20 U.S.C. § 1078–3(c) and the Regulations promulgated by the Department of Education at 34 C.F.R. § 685.220. Neither the statute nor the regulations makes any reference to bankruptcy or the dischargeability in bankruptcy of student loans. Whether or not the 1998 restructuring of terms was a true "consolidation" as defined by federal non-bankruptcy law is not determinative of this Court's decision today, where the purpose was merely to bring the delinquent loan current by capitalizing the interest and extending the term.

The well-known policies behind the student loan nondischargeability provision are summarized in *Hiatt*, as follows:

Congress included government guaranteed educational loans in the group of presumptively *nondischargeable debts* because it believed that many student borrowers were abusing the "fresh start" policy by filing for bankruptcy and obtaining discharge of educational debt soon after graduation, before making any significant attempts at repayment. *See In re Nunn*, 788 F.2d 617, 619 (9th Cir.1986); *see also 3 Collier on Bankruptcy* § 523.18, at 523–148 & n. 2 (15th ed.1985) (citing H.R.Rep. No. 595, 95th Cong., 1st Sess. 133 (1979), U.S.Code Cong. & Admin.News 1978, pp. 5963, 6094). Congress permitted the discharge of educational debt, however, if the bankruptcy petition was filed at least five years after the loans first became due. *See also* 11 U.S.C. § 523(a)(8)(B) (creating undue hardship exception to nondischargeability provision). The enactment of the five year nondischargeability period thus reflected the congressional purpose of shielding the government guaranteed educational loan program from opportunities for abuse.

36 F.3d at 24.

As explained by the district court that created the *Brunner* test, the policy behind the undue hardship provision was to provide an alternative discharge basis, within five years of the loan becoming payable, for those few, unfortunate debtors whose situation was so hopeless that they should be granted a discharge without having to wait out the five years when the loan would be dischargeable as a matter of right. *In re Brunner*, 46 B.R. 752 (S.D.N.Y.1985). The five-year rule was thought to give the new graduate sufficient time to realize his enhanced earning power

so as to meet his payment obligation. *Id.* at 754. It was also thought to have the prophylactic effect of preventing abuse by debtors with large amounts of educational loans, little other debt, and well-paying jobs, who filed bankruptcy shortly after graduation in order to shed their student loans. *Collier on Bankruptcy* (15th Ed. Rev.), ¶ 523.LH[3][a].

The *Brunner* test was developed in this context of undue hardship as a shorter-term alternative to automatic dischargeability after five years. The *Brunner* district court recognized not only that prognostication of a debtor's future ability to pay over a period of years is mere guesswork, but also that part of what makes the hardship "undue" is the length of time over which financial difficulties are endured, stating:

After all, it is not unreasonable to hold that committing the debtor to a life of poverty for the term of the loan—generally ten years—imposes "undue hardship."

*In re Brunner*, 46 B.R. 752, at 754 (S.D.N.Y.1985). The Second Circuit echoed that sentiment, as follows:

Predicting future income is, as the district court noted, problematic. Requiring evidence not only of current inability to pay but also of additional, exceptional circumstances, strongly suggestive of continuing inability to repay over an extended period of time, more reliably guarantees that the hardship presented is "undue."

831 F.2d at 396.

■ Even before *Brunner*, bankruptcy courts were quick to recognize that one of the guiding principles underlying the undue hardship provision is that the greater the time span between the debtor leaving school and the filing of the petition, the weaker the policy interest becomes in making an educational loan nondischarge-

able. *Matter of Love,* 28 B.R. 475, 478 (Bankr.S.D.Ind.1983); *In re Savercool,* 51 B.R. 180, 182 (Bankr.W.D.N.Y.1985). This Court has said as much in *In re Lewis,* 276 B.R. 912 (Bankr.C.D.Ill.2002), that, all else being equal, the older the student loans are, the more readily they will be discharged. 276 B.R. at 919. This Court rejected, in *Lewis,* the lender's contention that a consolidation loan should preclude consideration of prior loan payments under *Brunner's* third prong. That holding was based, in part, on the simple reality that rewriting the loan terms is a paper transaction that often does not enhance a debtor's ability to pay the underlying debt and in no way wipes from the slate the debtor's prior financial hardship.[5] The same is true with respect to *Brunner's* second prong as well. This Court sees no justification for treating a debtor who signs a new note to restructure a delinquent loan worse than one who simply gives up and heads straight for bankruptcy relief.[6] Although the passage of time alone no longer serves as an automatic basis for discharge, this Court is of the opinion that it remains an integral part of the undue hardship determination under the *Brunner* test.

Accepting ISAC's interpretation of the second prong of the *Brunner* test would mean that student loans would be potentially nondischargeable for most of a borrower's working life in those instances where the borrower signed a consolidation note before seeking bankruptcy relief. The federal program permitting the consolidation of student loans was never intended to affect the dischargeability of the debt in bankruptcy.[7] This Court, although cognizant of the strong public policy which favors the repayment of student loans and of the need to maintain the stability of the student loan program for future generations of students, cannot accept ISAC's position, which has the potential of totally eviscerating a debtor's right to a fresh start.

The Court rejects ISAC's position that the term of the consolidation loan controls the analysis under *Brunner's* second prong, and now turns to the DEBTOR'S contention that expiration of the term of the original loan is dispositive. The Court disagrees with the DEBTOR'S position as well. The one thing that is clear from the 1998 amendment is that Congress intended to drastically alter the structure of the statute. Whereas, formerly, undue hard-

---

5. This Court sees many instances where the debtor, having fallen behind, and being threatened with legal action to obtain payment of the student loan is offered the option of having the delinquent original loan brought current through a restructuring. The restructuring may involve an adjustment in the interest rate and almost always involves capitalizing the accrued interest and amortizing the balance over a new term of between ten and thirty years. *See,* 20 U.S.C.A. § 1078–3(c)(2). The restructured terms are evidenced by a combined form "Loan Consolidation Application and Promissory Note." Because the accrued interest is capitalized, the new monthly payment amount is often higher than the original payment amount, as it was in the case before the Court. In situations where the "consolidation" is simply a vehicle to take the loan out of default status and extend its term,

the Court would suggest that the "consolidation" runs primarily in the lenders' favor and is often to the detriment of the debtor.

6. In fact, seeking a restructuring of the loan would be viewed under the third prong of the *Brunner* test as a demonstration of good faith.

7. It would appear that "consolidation" loans, like initial student loans, are made "almost without regard for creditworthiness." *See, Brunner,* 46 B.R. 752, 756 (discussing initial student loans). Indeed, "consolidation" loans for the purpose of restructuring the loan terms after default would be necessarily granted to the worst credit risks of all student borrowers, i.e., those most in need of bankruptcy relief.

ship was the infrequently invoked exception to the general rule of automatic discharge after a set number of years, undue hardship is now the only avenue by which government insured student loans may be discharged. In effect, Congress has moved from a structure that relied upon the passage of time as a bright line standard, to one that subsumes that factor within the undefined and inherently amorphous standard of undue hardship. Congress must have intended that bankruptcy courts consider the age of the debt to be but one factor to be evaluated as part of the whole picture, i.e., the totality of the circumstances. Accordingly, in light of the 1998 amendment, this Court rejects the position of both parties and concludes that neither the term of the original loan nor the term of the consolidation note controls the analysis under *Brunner's* second prong. The Court will consider, among the totality of the circumstances, both the age of the original loan and the terms of and purpose for the consolidation note.

■ The DEBTOR has been struggling to pay her student loan since 1991 and the ten-year term of the original loan had elapsed before she sought bankruptcy relief. The 1998 consolidation loan, entered into seven and one-half years after the original loan first became due, was a restructuring that did not involve an advance of new funds or any new risk assumed by a different lender or guarantor. Its purpose was to bring the delinquent loan current, capitalize the accrued interest and extend the term to 2013. It was not a consolidation of multiple loans. The DEBTOR started with a loan balance of $7,800.00 in 1991. Because she could not even keep up with the interest accrual, the balance increased to $13,423.90 at the time of the 1998 restructuring, and increased to over $15,000.00 by the date of bankruptcy.

There is no evidence that the DEBTOR has ever enjoyed more than a modest standard of living. She has accumulated no significant wealth or property of any kind since the loan first became payable. Even after her discharge in bankruptcy, she is living from hand to mouth, relying on public aid, child support, and the generosity of family. With the birth of her second child, her circumstances are not likely to improve any time soon.

The DEBTOR cannot afford the consolidation note payments of $130.00 per month, or any lesser amount at present. If she is able to return to work and earn more than a poverty level wage, she will lose her food stamps. Based on the evidence, the Court concludes that the DEBTOR will be unable to pay the student loan at any time in the reasonably foreseeable future. Based upon the totality of the circumstances, the Court finds that the DEBTOR has met her burden under the second prong of the *Brunner* test.

### 3. Good Faith Efforts to Repay.

■ The DEBTOR made payments, off and on, over virtually the entire term of the loan, ultimately repaying a sum equal to 22% of the original loan amount by the time of the 1998 restructuring. The DEBTOR testified that she made additional payments since the restructuring. ISAC disputes this allegation and neither party offered any documentary evidence to substantiate their position. There is circumstantial evidence in the record that supports the DEBTOR'S contention. If the DEBTOR made no post-restructuring payments, the accrual of interest would have brought the petition-date balance on the consolidation note to approximately $16,744.00. Since SSSC asserted in its proof of claim that the petition date balance was $15,036.00, it appears more likely

than not that the DEBTOR made some post-restructuring payments. Although she has not utilized her degree to obtain a full-time teaching position, she remained employed and advanced in the child care field until her family situation precluded it. Under these circumstances, the Court finds that the DEBTOR has made good faith efforts to repay the student loan thereby satisfying *Brunner's* third prong.

### 4. Partial Discharge of the Loan.

ISAC has suggested that it may be appropriate to discharge only a portion of the DEBTOR'S student loan. Having satisfied the *Brunner* test, however, the DEBTOR is entitled to a discharge of the entire loan pursuant to Section 523(a)(8).

This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate Order will be entered.

### ORDER

For the reasons stated in an Opinion entered this day, IT IS HEREBY ORDERED that the Plaintiff's student loan debt is determined to be dischargeable as an undue hardship pursuant to 11 U.S.C. § 523(a)(8) and Judgment is entered for the Plaintiff and against the Defendant.