**In re Keith MASON, Debtor.**

**Keith Mason, Plaintiff,**

v.

**Help Services Group, Inc. and Educational Credit Management Corporation, Defendants.**

Bankruptcy No. 03–00147.
Adversary No. 03–6122.

United States Bankruptcy Court,
D. Idaho.

Jan. 7, 2004.

for Defendant Educational Credit Management Corporation.

## MEMORANDUM OF DECISION

JIM D. PAPPAS, Chief Judge.

Chapter 7 Debtor Keith Mason ("Plaintiff") seeks to discharge debts he incurred to finance his education under the "undue hardship" exception in 11 U.S.C. § 523(a)(8). The facts establish a close case. However, after careful consideration, the Court concludes that only a portion of Plaintiff's student loan debt should be discharged.

### Procedural History

On January 16, 2003, Plaintiff filed for Chapter 7 bankruptcy relief. Ex. 16. Plaintiff commenced this adversary proceeding on April 29, 2003, attempting to discharge several debts owed to different lenders, all incurred by Plaintiff to finance his undergraduate and law school education. Educational Credit Management Corp. ("Defendant") is the successor-in-interest to several of the lenders Plaintiff named in his complaint. Docket No. 17. Plaintiff's claims against the other named lender-defendants were either dismissed, resolved by default, or settled prior to trial. *See* Docket Nos. 9, 13, 20, 29, 46. Thus, Defendant was the only lender appearing at trial.

The trial was conducted on December 12, 2003, at which both parties offered the testimony of witnesses, submitted documentary evidence, and advanced oral arguments for their respective positions. After due review of the relevant law, the arguments of the parties, and the record in this case, the Court intends the following to constitute its findings of fact and conclusions of law. Fed. R. Bankr.P. 7052.

### Facts [1]

Plaintiff is a thirty-three year old single man with no dependents. He currently

Eric R. Sloan, Cosho, Humphrey, Greener & Welsh, Boise, ID, for Plaintiff.

Scott A. Tschirgi, Jones, Gledhill, Hess, Fuhrman, Bradbury & Eiden, Boise, ID,

---

1. The Court's findings of fact are based, in part, upon the Court's opportunity to observe

lives in Boise, Idaho, and works as an independent contractor installing siding on houses. Plaintiff is in good health and is physically able to work. He is also well-educated, holding a bachelor's degree in philosophy from Boise State University and a law degree from Gonzaga University. Plaintiff's educational history demonstrates his ability to succeed in the face of adversity. However, borrowing to pay for his education has created serious financial consequences for Plaintiff.

In the third grade, Plaintiff was diagnosed with a learning disability. This disability has continued. It affects Plaintiff's ability to concentrate, to focus on details, and to read and write. According to the testimony of Plaintiff's mother, his parents initially thought he would be unable to complete high school or college. As it turned out, Plaintiff managed to cope with his disability.

During Plaintiff's junior year of high school, he stopped attending the public school and began attending an "alternative" school. Plaintiff graduated, enlisted in the Army, and after being discharged, joined the National Guard. In 1990, Plaintiff enrolled at Boise State University. In spite of his learning disability, he earned a degree and graduated from college in 1995. Ex. 1.

Plaintiff testified that after graduation, he moved home and began studying for the Law School Admission Test ("LSAT"). He also obtained a commercial driver's license and worked as a truck driver during this time. Plaintiff explained that his score on the LSAT was not particularly good. Although his undergraduate grade point average was also relatively low,

Plaintiff convinced the law school admission officials at Gonzaga to allow him to attend a summer program under the condition that his continued enrollment would depend upon his success in that program.

Plaintiff completed the law school's summer program in 1996, and he was allowed to undertake the usual course of legal studies. In June 1997, the university informed Plaintiff that he could not continue as a law student because his grade point average was too low. Ex. 5. Plaintiff appealed this decision, and during this process, the university arranged for him to undergo an educational assessment. Based on the results of that assessment, Ex. 9, the university allowed Plaintiff to continue his studies and made certain accommodations based on Plaintiff's learning disability, such as allowing Plaintiff more time to complete exams. Ex. 8. In May 1999, Plaintiff graduated with a law degree from Gonzaga. Ex. 3.

Despite Plaintiff's accomplishments, he had difficulty putting his education to use. In December 1999, Plaintiff went to work for MicronPC in Boise as a "process analyst" with the hope of ultimately joining their legal department. He earned $26,000 per year in this position. In 2000, Plaintiff took the Idaho bar exam; he did not pass. While he could do so, he has not since attempted to pass the exam. In May 2001, Plaintiff became a "government contracts technician" at Micron, but was laid off in January 2002. Ex. A. Plaintiff earned $14.00 per hour at this job. After receiving unemployment benefits for a few months, Plaintiff began working as an independent contractor in April 2002, install-

---

the demeanor of the witnesses who testified at trial. These findings incorporate the Court's assessment of the witnesses' credibility. Because some of the Court's findings of fact relate to specific components of the "undue

hardship" analysis required by § 523(a)(8), for clarity and convenience, those findings are included in the relevant portions of the legal discussion below.

ing home siding for Diamond Construction. Ex. H.

As mentioned earlier, Plaintiff filed a petition for relief under Chapter 7 of the Bankruptcy Code on January 16, 2003. Ex. 16. According to Plaintiff's Schedule F, Ex. 16, Plaintiff owed $209,070.91 in unsecured, nonpriority claims, the lion's share of which was for student loan debts. Plaintiff acknowledged at trial that he owed Defendant in the neighborhood of $100,000, although he was not sure of the exact amount. *See also* Pl.'s Pretrial Mem. at 3 (indicating evidence at trial would show Plaintiff owed Defendant's predecessors-in-interest approximately $100,000 in principal and accrued interest).[2]

### Disposition

■ The Bankruptcy Code excepts from discharge any debt:

For an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship, or stipend, *unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents* [.]

11 U.S.C. § 523(a)(8) (emphasis added). The Ninth Circuit has adopted what is known in bankruptcy circles as the *"Brun-*

*ner* test" for determining whether requiring a debtor to repay student loans represents an undue hardship. *United Student Aid Funds, Inc. v. Pena (In re Pena)*, 155 F.3d 1108, 1112 (9th Cir.1998) (adopting the undue hardship analysis set forth in *In re Brunner*, 46 B.R. 752 (S.D.N.Y.1985), *aff'd* 831 F.2d 395 (2d Cir.1987)). To discharge student loan debt, this test requires proof that: (1) the debtor cannot, based on current income and expenses, maintain a minimal standard of living for himself or herself and any dependents if forced to repay the loans; (2) additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) the debtor has made good faith efforts to repay the loans. *Id.* at 1111.

■ Recently, the Ninth Circuit has confirmed that "bankruptcy courts may exercise their equitable authority under 11 U.S.C. § 105(a) to partially discharge student loans." *Saxman v. Educ. Credit Mgmt. Corp. (In re Saxman)*, 325 F.3d 1168, 1173 (9th Cir.2003). In this action, Plaintiff has asked the Court to discharge all or part of his debt. Second Am. Compl. at 4, Docket No. 29. Specifically, *Saxman* explains that a bankruptcy court may, in the exercise of its discretion, grant a partial discharge of student loan debt, provided that "[a] debtor who wishes to obtain a discharge of his student loans ... meet[s] the requirements of § 523(a)(8) *as to the*

---

**2.** Defendant presented no competent evidence at trial establishing the amount due on Plaintiff's loans with Defendant's predecessors. Therefore, the Court will accept Plaintiff's estimates as the best evidence of the balances. In addition, the Court was not provided any evidence concerning the total amount of nondischargeable student loan debt Plaintiff owes other creditors. Plaintiff's complaint estimates the total amount of student loan debt owed to the various lenders to be $193,000.

Second Am. Compl., ¶ 11, Docket No. 29. In addition, in a Stipulation for Partial Discharge filed in this action on December 10, 2003, Plaintiff and lender Help Services Group, Inc. have agreed that Plaintiff's debts to that lender will be discharged in bankruptcy to the extent they exceed $65,000, and the parties have agreed to a repayment plan dependent upon Plaintiff's income. Docket No. 44, ¶¶ 2, 4–6.

*portion of the debt to be discharged before that portion of his or her debt [is] discharged."* 325 F.3d at 1174 (emphasis added). *See also Cota v. U.S. Dep't of Educ. (In re Cota),* 298 B.R. 408, 422 (Bankr.D.Ariz.2003) ("the court ... may elect to only discharge a portion of the debt.").

By sanctioning partial discharges, the *Saxman* decision establishes an important clarification concerning student loan dischargeability. But the decision is also problematic for at least two reasons. First, the court did not reconcile the bankruptcy court's ability to grant partial discharges with the *Pena/Brunner* paradigm. To grant a partial discharge, *Saxman* requires that the bankruptcy court conclude that all the *Brunner* elements for an undue hardship discharge have been established. Then, and even though the debtor has seemingly established the right to a full discharge of the student loan debt under the statute, *Saxman* instructs the bankruptcy court to consider scaling back that relief based upon equitable considerations. In this respect, *Saxman* seems incongruous with the teachings of *Pena/Brunner.*

*Saxman* also fails to offer any practical guidance to the bankruptcy court concerning *how* to craft a partial discharge. The decision does not address how the bankruptcy court should determine the amount of student loan debt that should be "partially" discharged. Nor does it explain how to decide, when faced with several student loans, which debts to discharge and which to leave unaffected by the bankruptcy. In addition, *Saxman* offers no

guidance concerning the extent of the bankruptcy court's discretion in establishing terms of repayment of student loans not discharged. *See* Madeleine Wanslee, *Ninth Circuit Embraces Partial Discharge of Student Loans,* Norton Bankr.L. Advisor, Aug. 2003, at 6, 8 (identifying many questions unanswered by *Saxman* regarding application of the decision). Obviously, under *Saxman,* much is left to the discretion of the bankruptcy court.

■ In spite of the lack of guidance from the Ninth Circuit on these important issues, the Court will endeavor to apply the *Brunner* test, as modified by *Saxman,* to the facts presented in this action. In doing so, the Court must consider first whether Plaintiff has shown it would be an undue hardship for him to repay any of his student loan debt owed to Defendant, or, stated differently, whether he has shown that he is entitled to a full discharge. Then, if Plaintiff has failed to meet his burden in satisfying the *Brunner* test with regard to a full discharge, the Court must consider whether Plaintiff has shown that it would be an undue hardship if he were required to pay some portion of debt to Defendant, or, in other words, whether Plaintiff has shown that he is entitled to a partial discharge.[3]

### The *Brunner* Elements

#### A. Plaintiff can not maintain a minimal standard of living.

■ The *Brunner* test requires the bankruptcy court to compare a debtor's current income to current expenses to

---

**3.** To reconcile *Saxman* and *Pena/Brunner* and the Ninth Circuit's endorsement of partial discharges under § 523(a)(8), bankruptcy courts should no longer treat a debtor's student loan debt as an indivisible whole, to be either discharged or excepted from discharge in its entirety. Instead, consistent with the language of *Saxman,* the spectrum of relief eligible to a debtor pursuing a § 523(a)(8) action ranges from a full discharge to no discharge at all, with the outcome dependent upon the particular facts of each case and the sufficiency of the evidence.

determine whether the debtor has the present ability to repay student loans. *Delbridge v. ASFA Data Corp. (In re Delbridge),* 03.2 I.B.C.R. 112, 113 (Bankr.D.Idaho 2003). But the debtor must show more than simply tight finances. *Id.* Here, Plaintiff must show either that his income is insufficient to meet necessary expenses, or that he would be unable to maintain a minimal standard of living if required to repay student loans. *See Rifino v. United States (In re Rifino),* 245 F.3d 1083, 1088 (9th Cir.2001); *England v. United States (In re England),* 01.3 I.B.C.R. 91, 92 (Bankr.D.Idaho 2001).

As a siding installer, Plaintiff earns $10 per hour. However, because of seasonal fluctuations in construction, Plaintiff reports that he only earned $550 in gross wages in November 2003. *See also* Pl.'s Pretrial Mem. at 5, Docket No. 37. He testified that he received a gift of $500 from his parents to help him with living expenses for the month. *Id.* Jim Mason, Plaintiff's father, testified that he will continue to assist Plaintiff, as needed, for as long as he is able to do so. More important to this analysis though, Plaintiff testified that his income as a siding installer usually averages between $1,000 and $1,200 per month. *See In re Pena,* 155 F.3d at 1112 (approving the use of average income when a debtor's income fluctuates). Accordingly, for these purposes, the Court finds that Plaintiff's current income is between $1,000 and $1,200 per month.

As for current expenses, Plaintiff testified that some of his expenses have changed from the time of his bankruptcy filing, as reflected in his Schedule J, Ex. 16. This Schedule lists a total of $1,739 in monthly expenses. At trial, Plaintiff explained that while most of the listed expenses were the same, his food bill had decreased by $150, his health insurance had decreased by $297 because he no longer carried such insurance, and his clothing budget had decreased by $50. Plaintiff also testified that his transportation costs had increased by between $40 and $90, and that he was now paying about $9 per month for a gym membership. Considering all of these changes, the Court finds that Plaintiff's expenses are between about $1,300 and $1,340 per month.[4]

The parties seem to agree that Plaintiff lacks sufficient income to repay his student loans in full while maintaining even a minimal standard of living. Although Defendant's counsel argued that Plaintiff's expenses are only $1070, he acknowledged that even if Plaintiff were required to make a monthly payment on Defendant's debts of only $164, as calculated under the Income Contingent Repayment Plan ("ICRP"), Plaintiff does not have the ability to make those payments. Def.'s Pretrial Mem. at 4, Docket No. 36. At trial, Defendant did not challenge Plaintiff's testimony as to the amount or legitimacy of his expenses, and while the Court may excluded unreasonable or unnecessary expenses from the calculation under the first prong of the *Brunner* test, *see In re Delbridge,* 03.2 I.B.C.R. at 113, none of Plaintiff's expenses appear excessive or unnec-

---

4. Plaintiff testified his 1978 car, while operable, is in need of major repairs. Because Plaintiff needs reliable transportation to and from work, and because he needs some type of health insurance, his reasonable and necessary expenses are likely to increase in the future. In addition, as noted above, Plaintiff must begin making monthly payments of at least $50 in February 2004 to service other nondischargeable student loan debt. Stipulation for Partial Discharge, ¶ 4, Docket No. 44. Consequently, the Court concludes Plaintiff is not maintaining even a minimal standard of living at this time because his budget excludes several necessary expense items.

essary.[5]

Plaintiff has satisfied the first prong of the *Brunner* test because the evidence shows he can not maintain a minimal standard of living if forced to repay the loans under the repayment option that would offer the lowest monthly payment. At the same time, these facts also lead the Court to conclude, for purposes of a partial discharge analysis, that Plaintiff has no current ability to pay even a portion of his obligation to Defendant. If Plaintiff had some amount of discretionary income, even if not enough to make full payments to Defendant under the ICRP, it would be relatively easy to identify a portion of Defendant's debt that should be discharged. However, the facts show that Plaintiff has no current ability to pay Defendant. Thus, even if Plaintiff can not show he should be entitled to a full discharge under the remaining elements of the *Brunner* test, any partial discharge considered by the Court must take into account Plaintiff's current inability to make payments.

## B. Plaintiff's Financial Condition is Likely to Persist.

 The Bankruptcy Appellate Panel has explained the application of the second *Brunner* prong: "There must be evidence that the debtor's road to recovery is obstructed by the type of barrier that would lead [the court] to believe he will lack the ability to repay for several years." *Pennsylvania Higher Educ. Assistance Agency v. Birrane (In re Birrane)*, 287 B.R. 490, 497 (9th Cir. BAP 2003) (internal quotations and citations omitted). For examples, the Panel pointed to a debtor's psychiatric problems, lack of usable job skills, severely limited education, physical problems, or other obstacles that are either insurmountable or that significantly impair a debtor's ability to work. *Id.* at 497–98.

Here, the evidence shows that Plaintiff suffers from a long-standing learning disability. This problem affects both his capacity to work with details, and his ability to interact with others in writing. These limitations certainly diminish Plaintiff's prospects of succeeding at a professional career. However, Dr. Collins, a Ph.D. and certified forensic vocational expert, testified at trial that Plaintiff has apparently mastered several strategies to cope with his limitations, and likely could function in several professional fields, assuming an employer was willing to make certain accommodations for his condition.

In summary, Plaintiff seems to suffer from a relative disadvantage compared to other job applicants. This disadvantage also appears to be permanent and would exist without regard to the specific professional field Plaintiff pursued, be that law, banking, law enforcement, or something else. Still, Plaintiff is young, educated, and has a history of succeeding despite his limitations.

The record in this case presents an exceedingly close question as to the second prong of the *Brunner* test. On the one hand, Plaintiff is not licensed to practice law, something which probably deprives him of the ability to get the greatest benefit from his most valuable asset, his law degree. Also, Plaintiff has been out of law school for over four years and has gained

---

**5.** One expense items deserves special mention. Under these facts, it is doubtful Plaintiff's gym membership is necessary. Plaintiff is a young, healthy man that earns his living by performing physically demanding labor, which likely provides plenty of exercise. On the other hand, Plaintiff budgets nothing for entertainment, and the amount of the gym dues is, in this context, insignificant. Even if the Court reduced Plaintiff's expenses by the monthly cost of the membership, Plaintiff's current expenses would still substantially exceed his current income.

no significant professional experience to offer a potential employer. While Plaintiff possesses a commercial driver's license, he also does not have any recent or significant experience as a truck driver, and testified that he lacked confidence that he could actually operate most large trucks. In addition to Plaintiff's dim outlook for obtaining a high-paying professional position, it is likely Plaintiff's expenses will increase. *See* footnote 4, *supra.*

On the other hand, as Defendant points out, Plaintiff could retake the bar exam, and if he passes, he could obtain a law license. Despite Plaintiff's concerns about the relatively low success rate for repeat applicants for admission to practice law in Idaho, presumably, assuming he took the time and made an adequate effort to study, there appears to be no reason why Plaintiff could not eventually pass the bar exam. With a law license, even if Plaintiff were not able to secure employment at a law firm, corporation or a governmental agency, he could presumably succeed as a solo practitioner. By the same token, given enough time and some luck, Plaintiff could conceivably locate a job commensurate with this education that does not require a license to practice law.

Returning to the *Brunner* test, and while it is a close call, the Court is persuaded that Plaintiff's financial circumstances will likely improve, at least over a significant period of time. In other words, at some point in time, Plaintiff will probably be able to make payments on his student loan debt to Defendant.

However, Plaintiff has shown that he is facing one of the types of barriers to repayment identified by the Panel in *Birrane,* at least in the short term. Moreover, given the amount Plaintiff owes in student loan debt, while the Court concludes that Plaintiff will likely, at some time, be able to make payments to Defen-

dant, the Court concludes Plaintiff's financial condition will not likely improve to the extent necessary to allow Plaintiff to pay the total amount owed to Defendant. Therefore, Plaintiff has satisfied the second prong of the *Brunner* test with respect to a portion of his student loans. This is discussed more specifically below.

## C. Plaintiff has demonstrated good faith.

 Good faith, in the context of student loan discharge cases, encompasses a variety of factors, but the case law focuses courts on a debtor's attempts to obtain employment, maximize income and minimize expenses. *In re Birrane,* 287 B.R. at 499 (quotations and citations omitted). Consideration is also placed on a debtor's efforts to deal with repaying student loans, be that through making payments, seeking deferments when unable to pay, or negotiating manageable repayment terms. *Id.* A history of making or not making payments is, by itself, not dispositive. *Id.* at 499–500.

The record in this case adequately supports Plaintiff's good faith. Plaintiff has attempted to maximize his income and minimize his expenses. As explained above, Plaintiff is not living an extravagant lifestyle. He drives an older car that is in serious need of repairs, he does not own a television, and he does not maintain health insurance. At the same time, Plaintiff did attempt the bar exam in order to put his legal education to optimum use, although he failed the test. Thereafter, Plaintiff sought other employment, worked for some time at Micron, and then was laid off. And after several months of looking for work while on unemployment, Plaintiff began installing siding because, apparently, that was the only work he could secure at the time. Since then, Plaintiff has continued to look for a higher paying job, al-

though perhaps not as vigorously as he could.

Plaintiff has also shown that he has attempted to negotiate with his student loan creditors. Although the details were not especially clear, at some point near Plaintiff's graduation from law school, he attempted to enroll in an Income Sensitive Repayment Plan. For reasons unknown to Plaintiff, his application was not approved. Later, as Plaintiff struggled financially, his parents assisted him in attempting to resolve his student loans by, among other things, contacting an ombudsman with the Department of Education and by contacting Plaintiff's multiple lenders, including making a personal visit to one lender's headquarters in Virginia. Plaintiff also testified that he made payments toward his student loans until he was laid off from Micron, and that he has not made payments since then because he has not had the money to do so. Plaintiff has now made arrangements to repay one student loan creditor approximately $65,000. Docket Nos. 44, 46, 47.

Defendant disputes that Plaintiff has shown his good faith. Defendant points to Plaintiff's failure to attempt the bar exam a second time, his failure to obtain a second, part-time job in the evening, and his failure to sign up for the ICRP. According to Defendant, Plaintiff should either spend his free time earning additional money or studying for the bar exam.

There is some merit in Defendant's analysis. It makes sense that Plaintiff should devote a substantial amount of his time to either obtaining a license to practice law, increasing his efforts to locate a higher-paying job, or working at a second job. Plaintiff explained that he is using the free time created by the seasonal lull in his siding job to look for a better job, and that he has not changed jobs because, in his present position, he has the flexibility to attend job interviews.

As for the ICRP, Plaintiff testified that he could not afford to make any payment on Defendant's loans given his current income. Plaintiff also explained that he was reluctant to sign up for the ICRP because of the alleged negative long-term tax consequences. Under the terms of the ICRP, any amounts that a borrower is unable to repay over a twenty-five year period are forgiven, and Plaintiff is concerned that because he owes so much to Defendant, and he is not likely to ever earn enough to pay Defendant in full, that at the end of the ICRP term a large portion of Plaintiff's debt will be forgiven, and this debt forgiveness will be treated as taxable income. *See* 26 U.S.C. § 108(a), (f); *In re Birrane*, 287 B.R. at 500 n. 7; *In re Williams*, 301 B.R. 62, 78–79 (Bankr. N.D.Cal.2003) (discussing the same argument).

While Defendant makes some legitimate points, all things considered, the Court is persuaded that Plaintiff has made a good faith attempt to repay his loans. Plaintiff attempted to put his law degree to use, and when that attempt proved unsuccessful, he sought out other employment. When he lost his job, Plaintiff actively sought out other employment, taking available work even though it was outside of his preferred profession. Plaintiff has made payments on his student loans when able, and has consistently tried to negotiate with his lenders, even reaching a settlement with one. Therefore, the Court concludes that Plaintiff has met the third prong of the *Brunner* test as to all of his student loan debt.

### D. Partial Discharge.

█ To summarize, Plaintiff has satisfied the first and third prongs of the *Brunner* test as to the total amount of student

loan debt held by Defendant. However, Plaintiff failed to satisfy the second prong as to the total amount owed on his student loan debt. Therefore, Plaintiff is not eligible for a discharge of all amounts owed to Defendant under § 523(a)(8). *See In re Birrane*, 287 B.R. at 499. On the other hand, Plaintiff did establish that he would experience an undue hardship if forced to repay *all* of his student loans. Thus, under *Saxman*, the Court concludes Plaintiff is entitled to a partial discharge. 325 F.3d at 1174–75. Because *Saxman* premised the authority to grant a partial discharge on the equitable powers granted by Congress to bankruptcy courts under § 105(a),[6] and because case law offers little guidance in crafting a partial discharge, the Court must exercise its discretion in fashioning appropriate relief here.

To the Court, three facts in this case are paramount to granting Plaintiff effective, but appropriately limited relief. First, Plaintiff currently lacks the ability to make payments to Defendant. Second, because of Plaintiff's learning disability and other circumstances, he will likely need more time, perhaps more than most, to secure a job in which he can put his education to use, and thereby maximize his earnings. And third, given enough time, if he works at it diligently, Plaintiff should be able to find such employment.

In addition, in fashioning appropriate relief under these facts, the Court is guided by two fundamental bankruptcy principles. First, Plaintiff should be allowed a temporary "breathing spell" during which Defendant, even though holding a nondischargeable debt, is prevented from acting to collect, and Plaintiff is allowed to attempt to put his finances in order. By the same token, Defendant's right to collect should not be indefinitely postponed. Second, any partial discharge granted by the Court should afford Plaintiff a financial "fresh start." Under these facts, Plaintiff should be held accountable for a fair amount of the cost of his education while he attempts to use his degrees.

Under the circumstances, and as allowed by § 105(a), the Court concludes it should temporarily suspend Plaintiff's obligation to make payments to Defendant, as well as temporarily abate the accrual of any new interest on the debt. In the exercise of the Court's discretion, considering Plaintiff's predicament, the Court concludes that two years is a reasonable time for Plaintiff to take the steps required to significantly improve his financial situation.

Further, under these facts, the Court concludes it is appropriate to discharge a portion of the total debt owed by Plaintiff to Defendant. As noted above, the Ninth Circuit has given the Court little guidance in determining how much debt to discharge, but presumably, the equities of individual cases will dictate an appropriate methodology. Assuming Plaintiff is given two years to address his financial dilemma, at the end of that time, the Court concludes Plaintiff should be justifiably expected to pay at least $250 per month to Defendant on the student loan debt, in addition to paying his other expenses. And in light of Plaintiff's age and his post-educational experiences, the Court concludes it would be reasonable to expect that Plaintiff continue to pay on Defen-

---

**6.** The Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a).

dant's debt for twenty-five years, the maximum term under the ICRP. Assuming the worst, if Plaintiff's finances improve only enough to allow Plaintiff to make the minimum monthly payment on Defendant's debt for the entire repayment period, and assuming reasonable interest (say, eight per cent per annum) accrues on Defendant's debt over that period, Plaintiff should be able to retire approximately $32,400 in principal.[7] Based on this approach, the Court will grant Plaintiff a partial discharge of Defendant's debt to the extent it exceeds this sum.

Of course, if Plaintiff's financial situation improves after two years such that he could make higher payments, Defendant is free to insist upon an accelerated repayment schedule, lest Plaintiff enjoy the windfall of both a reduced debt and a lengthy period of repayment. Alternatively, Plaintiff should be entitled to the benefit of any repayment programs made available to other student borrowers in the future to repay this debt. If Defendant's demands on Plaintiff to pay this debt become too severe, Plaintiff can also consider the protection afforded by a debt repayment plan under Chapter 13 of the Bankruptcy Code. Finally, and perhaps the most sensible of the alternatives, the parties can always privately negotiate an acceptable debt repayment plan for the non-dischargeable portion of the debt.

### Conclusion

Plaintiff failed to establish that it would cause him undue hardship, as defined by the *Brunner* test, if forced to repay any part of his student loans. However, Plaintiff did show, consistent with *Saxman*, that it would be an undue hardship for him to repay the total amount due on his loans to Defendant.

In the exercise of the Court's equitable powers under § 105(a), Plaintiff will be granted a discharge as to all amounts owed to Defendant in excess of $32,400. That sum will be excepted from discharge. In addition, the Court will order that Plaintiff's obligation to Defendant be suspended, and that no interest accrue on this amount, for a period of two years from the date of entry of the Court's judgment in this action. After two years, both parties may resort to whatever legal rights and remedies may be available to them to resolve their debtor-creditor relationship.

Counsel for Plaintiff shall prepare, and counsel for Defendant shall approve, a form of judgment consistent with this decision, which shall be promptly submitted for entry by the Court.

7. Obviously, this is an estimate. If the actual interest rate on Plaintiff's loans with Defendant is less than 8% per annum, Plaintiff could retire a larger amount of principal over the same period of time. In this event, Defendant would be "shorted" in that Plaintiff could pay off the debt in a shorter period of time than that deemed "reasonable" by the Court. Plaintiff would be similarly disadvantaged if the actual rate of interest due on his loans with Defendant is higher than that estimated by the Court; he will likely have to pay over a longer period of time to satisfy the debt. Such imprecision can not be avoided because under *Saxman*, the Court's task in designing an appropriate partial discharge solution is not science, but more like educated guesswork. The Court has attempted to do its best writing on a nearly blank slate guided only by its conscience and the facts of this case.